102 F.3d 433
 96 Cal. Daily Op. Serv. 9011, 96 Daily Journal
D.A.R. 14,930
Penelope WATSON, Petitioner-Appellant,
v.
Sherman BLOCK, Sheriff; Daniel E. Lungren, Attorney General
for the State of California; Hon. William R. Pounders,
Judge of the Superior Court of the State of California for
the County of Los Angeles, Respondents-Appellees.
 No. 94-56346.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Aug. 11, 1995.
Decided Dec. 13, 1996.
 
 Garrett J. Zelen, Los Angeles, CA, for petitioner-appellant.
 Frederick R. Bennett, Assistant County Counsel, Los Angeles, CA, for respondents-appellees.
 Appeal from the United States District Court for the Central District of California, D.C. No. CV-94-6012-RAG; Richard A. Gadbois, District Judge, Presiding.
 Before: BROWNING, NORRIS and REINHARDT, Circuit Judges.
 WILLIAM A. NORRIS, Circuit Judge:
 
 
 1
 Attorney Penelope Watson appeals the denial of her habeas petition claiming that her due process rights were violated when she was held in summary contempt. We reverse.
 
 
 2
 Ms. Watson represented William Mora in a multi-defendant special circumstances murder trial that began on March 28, 1994, in Los Angeles Superior Court, Judge William R. Pounders presiding. On April 7, an attorney for one of Mora's codefendants repeatedly raised in open court the issue of the punishment the defendants would be eligible for should they be convicted. Calling counsel to the bench, Judge Pounders stated categorically that possible punishment "is not a subject open to discussion. It should not be explored." Ms. Watson remained at the defense table during this side bar; her cocounsel, Joseph Albert Gutierrez, was present on behalf of their client Mora.[1]
 
 
 3
 On April 20, the attorney for a different codefendant again raised the issue of punishment. In response, Judge Pounders stated in open court:
 
 
 4
 [T]he subject of sentencing of [the codefendant] is not part of the conversation. But more than that, it is prejudicial under [Cal.Code of Evidence, section] 352. It's not a subject the jury is entitled to discuss.
 
 
 5
 This is not a death penalty case, so penalties are not something to discuss, and a penalty given to a juvenile involved in the same activity is something that would only serve to confuse.
 
 
 6
 On April 21, Ms. Watson's cocounsel Mr. Gutierrez asked a series of seven questions in which he stated that the defendants were "looking at life in prison." At side bar, which Ms. Watson did not attend, Judge Pounders told her cocounsel Mr. Gutierrez,
 
 
 7
 You had an ulterior motive in bringing out the amount of time [the witness] spent [in prison], and I think it's to show the contrast between what he got and what your clients may be facing.... I'm saying that's the last time I want to hear anything about a sentence.... You've covered it. Do not cover it again.... I can only believe that you're doing it to persuade the jury about how serious the charges are and that's not something they're permitted to discuss, and you know that and we've already talked about it.
 
 
 8
 Although Ms. Watson was in the courtroom at the time of Mr. Gutierrez's examination and the bench conference it triggered, she remained at counsel table rather than going to the bench. Following the side bar, Mr. Gutierrez apologized in open court:
 
 
 9
 MR. GUTIERREZ: Judge, I would just like the record to reflect that I apologize to this court for asking the question as to or informing this witness through my question that he served six months in jail and three years probation. It was my understanding that we couldn't go into the fact that he was convicted of 245, but I thought that it would be appropriate to bring out the time that he was sentenced and the probation that he had, and I obviously defied the Court Order, and I misunderstood the Court and I apologize.
 
 
 10
 In accepting this apology, Judge Pounders stated in open court:
 
 
 11
 It's simply that punishment is not an issue for this jury to decide, and the more that counsel want to harp on this issue of punishment, the more inappropriate it becomes.
 
 
 12
 On June 21, while questioning her client on redirect examination, Ms. Watson asked "You've been in custody for four years?" After a question regarding the conditions of the incarceration, Ms. Watson asked, "And during that four years, you were facing the death penalty until just the day before we started." Judge Pounders sustained an objection and stated "We've already talked about this at side bar. Follow the court's admonitions." Immediately after this admonition to "follow the court's admonitions," Ms. Watson's next question of her client was, "You're facing life without the possibility of parole?"
 
 
 13
 Another side bar followed immediately. Judge Pounders asked Ms. Watson why he should not hold her in contempt for covering potential penalties after he had "at least twice ordered counsel not to cover [it]." She explained that she was attempting to elicit from her client testimony that she thought was relevant. The complete colloquy was as follows:
 
 
 14
 THE COURT: I would like to know why I should not hold you in contempt of court for having covered something that I've at least twice ordered counsel not to cover, which is the potential penalty faced by these defendants since it is not an issue for a jury determination.
 
 
 15
 MS. WATSON: I think it goes to his state of mind as to why he would take this risk at this point in revealing that he was the person who called 911....
 
 
 16
 THE COURT: Is there any reason why you didn't want to raise this at side bar without the presence of the jury, recognizing that I have at least twice admonished counsel not to cover it? And especially your cocounsel Mr. Gutierrez, when he's gone into it, I admonished him not to do it further. Is there any reason why we couldn't discuss this before you brought it up?
 
 
 17
 MS. WATSON: No. I wasn't at side bar with any of that involving Mr. Gutierrez, and I honestly thought it's the most relevant thing in the world to why he would say he called 911.
 
 
 18
 THE COURT: You're in violation of a court order. You do not think that's relevant to anything?
 
 
 19
 MS. WATSON: I didn't think it was.
 
 
 20
 At that point, Judge Pounders found Ms. Watson in contempt for violating section 1209(a)(5) of the California Code of Civil Procedure.[2] Judge Pounders stated:
 
 
 21
 I do find you in contempt of court. A very clear violation of contempt of court in the direct hearing and presence of the court, and the appropriate punishment will have to be determined at the conclusion of this trial since I can't incarcerate you during the trial.
 
 
 22
 I want everyone to understand when I issue an order, I plan to follow it up, and if you have any doubt about that, you're taking your own risk.
 
 
 23
 The next day, Judge Pounders issued a written order of contempt, finding that "the questions asked by contemnor ... in the presence of the jury had as [their] sole purpose improperly advising the jury of the potential penalty for the defendants in violation of the court Order" and that the "contemnor was aware of the Order." Order of Contempt, dated June 22, 1994, at 8. The order imposed a two-day jail sentence to be served after trial.
 
 
 24
 On July 8, two days after Mora's case was submitted to the jury, Judge Pounders gave Ms. Watson a further opportunity to explain her conduct. She again explained that she believed her conduct was justified because the testimony she was attempting to elicit was relevant. According to her counsel:
 
 
 25
 Miss Watson is not trying to say what she did was correct, but I want to show you what happened by way of implication of the thought process that was going on with her at the time.
 
 
 26
 Yes, Mr. Gutierrez [discussed penalties] and there was an apology.... Miss Watson certainly was aware of that happening.
 
 
 27
 What was being gone into at that moment by Miss Watson in her mind was a completely different type of issue. Not an issue of the penalty, not trying to get into the idea of getting before the jury what the possible punishment could be for the sympathy or prejudice value that it could have, but rather to understand why someone who potentially could face this-this terrible penalty would come forward with a 911 call ... and it had to do with the motive and what was going on, the state of mind of the witness, meaning the defendant at that time in regard to the 911 call....
 
 
 28
 ... [S]he believed there was a totally different set of circumstances that was not covered by the court's previous rulings or admonitions.
 
 
 29
 ...
 
 
 30
 ... Miss Watson was not in any way trying to be contemptuous of the court, ignoring of the court or disobeying of the court. In her mind, ... she saw a totally different justification for bringing this forward, and she was not attempting in any way to try and get around the court's order or to disregard the court's order.
 
 
 31
 Judge Pounders found this explanation unconvincing, believing instead that Ms. Watson was trying to make the point to the jury that the murder victim, a gang member, was not worth a life sentence for her client. Judge Pounders stated:
 
 
 32
 Now, assuming, but I don't b[u]y the idea that she did not know I had issued an order before saying don't go into this, [the admonitions on June 21 were] a sufficient signal to anyone of reasonable intelligence, and I know her to be beyond that ... to know that I've said don't do something. If she doesn't know what it is I've said don't do, the point is to go to side bar [for clarification].
 
 
 33
 She didn't do that. She goes right into the next point, and again a leading question ... she says, "You're facing life without possibility of parole" ...
 
 
 34
 ...
 
 
 35
 The only conclusion I can draw from that is her idea was it's more important to me as an attorney to see that this information goes to the jury.... I think she has permanently prejudiced this jury in favor of her client ... They know the penalty he's facing ... and they know that the person that was killed isn't worth that penalty, and so they are not going to find him guilty of the major charge.
 
 
 36
 ...
 
 
 37
 ... [G]enerally people do not hold the life of a gang member the same as they would a 13-year-old girl on her way to school that happens to be the accidental victim of the shooting instead of the gang member.
 
 
 38
 And when the penalty is as extreme as this one is presented to the jury, I think that's a prejudice that cannot be overcome....
 
 
 39
 This is a very difficult case ... for the prosecution. They don't have in this kind of a case much of a chance of getting a conviction when you're dealing with the same people that were involved in the activities ... the beating and the burning of the victim, as the defendants have been, so it is a precarious balance that the prosecution is trying to maintain, and she upset the balance where there is nothing that can be done to correct it.
 
 
 40
 ... And I believe that the result is going to be that [the jury] will not find Mr. Mora guilty of the main offense, which is murder, that they may not find him guilty of much at all....
 
 
 41
 Ms. Watson's habeas petitions to the California Court of Appeal and the California Supreme Court were denied. She now appeals the denial of her federal habeas petition.[3] Ms. Watson claims that her due process rights were violated because she did not have notice of the prohibited conduct. In addition, she argues that summary contempt procedure violated due process because the trial judge could not have known without a hearing whether or not her conduct was willful. See, e.g., United States v. Armstrong, 781 F.2d 700, 706 (9th Cir.1986) ("willfullness [sic] is an essential element of criminal contempt"). We do not address either of Ms. Watson's arguments because we hold that her conduct was not so disruptive as to justify the use of summary contempt procedure.
 
 
 42
 Due process requires that a person charged with contempt usually be given a hearing on the charges against her. In re Oliver, 333 U.S. 257, 275, 68 S.Ct. 499, 508, 92 L.Ed. 682 (1948) ("due process of law ... requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf"). Summary contempt proceedings are appropriate only for a "narrowly limited category of contempts." Id. This narrow category "includes only charges of misconduct, in open court, ... where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public." Id.; see also United States v. Wilson, 421 U.S. 309, 316, 95 S.Ct. 1802, 1806, 44 L.Ed.2d 186 (1975) (summary contempt appropriate when a refusal to comply with a court order "disrupts and frustrates an ongoing proceeding") (discussing Fed.R.Crim.P. 42(a)); Harris v. United States, 382 U.S. 162, 167, 86 S.Ct. 352, 356, 15 L.Ed.2d 240 (1965) (summary contempt proceedings under Rule 42(a) only permissible in "those unusual situations ... where instant action is necessary to protect the judicial institution itself"); United States v. Engstrom, 16 F.3d 1006, 1011 (9th Cir.1994) ("Rule 42(a) may only be used when contempt poses a threat to the orderliness of ongoing proceedings, that is, when prompt action is required"); United States v. Flynt, 756 F.2d 1352, 1363 (9th Cir.1985) (summary contempt proceedings under Rule 42(a) are justified when there is a need to "remedy a breakdown in the orderly operation of the judicial system"); In re Gustafson, 650 F.2d 1017, 1022 (9th Cir.1981) (en banc) (trial court has discretion to invoke summary contempt procedures "when the contemnor's conduct is 'such an open, serious threat to orderly procedure that instant and summary punishment, as distinguished from due and deliberate procedures ...., [is] necessary' ") (quoting Harris, 382 U.S. at 165, 86 S.Ct. at 354) (alteration in original); United States v. Abascal, 509 F.2d 752, 756 (9th Cir.1975) ("the 'need for immediate penal vindication of the dignity of the court' is the basis for Rule 42(a)").
 
 
 43
 Although we do not decide the issue whether Ms. Watson willfully disobeyed a court order, we can understand Judge Pounders' concern that her two questions might prejudice jurors in favor of her client by conveying the message that the life of a gang member was not "worth" life imprisonment for her young client. Nonetheless, we are not persuaded that these two questions posed a threat to the orderly administration of justice sufficient to justify summary contempt procedure. These two questions, when viewed in the context of a three-month long trial, did not constitute " 'such an open, serious threat to orderly procedure that instant and summary punishment was necessary,' " Gustafson, 650 F.2d at 1022 (quoting Harris, 382 U.S. at 165, 86 S.Ct. at 354), given the "principle that only '[t]he least possible power adequate to the end proposed' should be used in contempt cases." Wilson, 421 U.S. at 319, 95 S.Ct. at 1808 (citation omitted).
 
 
 44
 The magnitude of the threat posed to the orderly administration of justice by Ms. Watson's two questions pales in comparison with the magnitude of the threat posed by the conduct of attorneys whose summary contempt citations we have upheld. For instance, in Gustafson, the defense attorney "openly disregarded the Court's rulings and directives" during closing argument, 650 F.2d at 1023, ignoring at least nineteen admonitions to slow down, id. at 1018, and engaging in "persistent argument on prohibited topics." Id. at 1020. In Hawk v. Cardoza, 575 F.2d 732 (9th Cir.1978) (per curiam), we upheld summary contempt citations issued against defense counsel nineteen times. We held that "the necessary evidence of ... actual obstruction" was established by "the trial judge's warnings to [the attorney], his special orders concerning conduct at trial issued before the trial began and [the attorney]'s continuing conduct and repeated violations of those orders." Id. at 735.
 
 
 45
 Unlike the attorneys held in summary contempt in Gustafson and Hawk, Ms. Watson did not engage in a pattern of repeated violations that pervaded the courtroom and threatened the dignity of the court. She was held in summary contempt for asking two questions during the course of a three-month trial. Nothing in the record indicates that she showed any disrespect for the court's authority at any other time. Nor does anything in the record indicate that Ms. Watson would have repeated the references to punishment or engaged in any other improper conduct unless she were immediately punished. Accordingly, we hold that the use of summary contempt procedure in the circumstances of this case violated due process. Cf. Abascal, 509 F.2d at 754, 756 (holding that summary contempt procedure violated due process because, although "[a]ppellant defied a clear order directed to him personally by the court, ... it does not appear that it was necessary for the court to order immediate incarceration").
 
 
 46
 The district court's order denying Ms. Watson's habeas petition is REVERSED, and the case is REMANDED for entry of judgment granting her petition.
 
 
 
 [1]
 At the post-verdict hearing on the contempt, Watson stated that she did not review the transcript of the bench conference
 
 
 [2]
 Section 1209(a)(5) of the California Code of Civil Procedure provides: "The following acts or omissions in respect to a court of justice, or proceedings therein, are contempts of the authority of the court: ... Disobedience of any lawful judgment, order, or process of the court."
 
 
 [3]
 Although Ms. Watson has served her two-day sentence, her appeal is not moot because she remains at risk of being disciplined by the California State Bar, in part because of her contempt conviction. Zal v. Steppe, 968 F.2d 924, 926 (9th Cir.1992)