POUNDERS, JUDGE, SUPERIOR COURT OF CALI-
FORNIA, LOS ANGELES COUNTY *v.*
PENELOPE WATSON

No. 96–1383.   Decided June 27, 1997

PER CURIAM.

In this case the Court of Appeals for the Ninth Circuit granted respondent's habeas corpus petition and held invalid on due process grounds her conviction for summary contempt before a state-court judge for conduct in open court. The Court of Appeals misinterpreted the constitutional requirements for imposition of a summary contempt order. We grant the petition for a writ of certiorari and reverse.

Respondent Penelope Watson is an attorney who represented William Mora in a multidefendant murder trial in the Superior Court of the State of California in and for the County of Los Angeles. The Honorable William Pounders presided over the case, and he is the petitioner here. On April 7, 1994, counsel for one of Mora's codefendants repeatedly raised in open court the issue of the punishment defendants might receive if they were convicted. Judge Pounders stated that possible punishment " 'is not a subject that's open to discussion. It should not be explored.' " App. to Pet. for Cert. 20. Though it is not clear whether this was said at a bench conference only or reiterated in open court, it seems respondent remained at the defense table during the bench conference. Her co-counsel, Joseph Gutierrez, was at the bench on behalf of their client Mora. In later proceedings, Judge Pounders noted that "Miss Watson is no more than six feet away from us when we're at the side bar conference. She's at the end of the center table closest to the bench and only a matter of feet away." *Id.*, at 36.

On April 20, counsel for a different codefendant again raised the issue of punishment. Judge Pounders stated in open court: "'[T]he subject of sentencing of Mr. Fernandez is not part of the conversation. But more than that, it is prejudicial under [Cal. Evid. Code Ann. § ]352 [(West 1966)]. It's not a subject the jury is entitled to discuss. This is not a death penalty case, so penalties are not something to discuss . . . .'" *Id.*, at 21.

The next day, respondent's co-counsel Gutierrez asked a series of questions in which he stated that defendants were "looking at life in prison." At a bench conference, while respondent remained at the defense table, Judge Pounders told Gutierrez:

> "'You had an ulterior motive in bringing out the amount of time [the witness] spent [in prison], and I think it's to show the contrast between what he got and what your clients may be facing. . . . I'm saying that's the last time I want to hear anything about a sentence. . . . You've covered it. Do not cover it again.'" *Watson* v. *Block*, 102 F. 3d 433, 435 (CA9 1996).

After the side bar, Gutierrez apologized in open court:

> "'Judge, I would just like the record to reflect that I apologize to this court for asking the question as to or informing this witness through my question that he served six months in jail and three years probation. . . . I obviously defied the Court Order, and I misunderstood the Court and I apologize.'" *Ibid.*

In response, Judge Pounders said in open court: "'It's simply that punishment is not an issue for this jury to decide, and the more that counsel want to harp on this issue of punishment, the more inappropriate it becomes.'" *Ibid.*

On June 21, while respondent was questioning Mora, the following examination and colloquy occurred:

By Ms. Watson: "[T]hroughout this trial sometimes you've had to get up at 4:00 in the morning and not go to sleep until 10:00 at night?

"Ms. Walker [for the People of California]: Objection, your honor, relevance.

"The Court: Sustained.

"By Ms. Watson: And during that four years [that you have been in prison], you were facing the death penalty until just the day before we started.

"Ms. Walker: Your honor, People are going to object.

"The Court: Sustained.

"Ms. Walker: Ask Miss Watson to be admonished and the Court—

"The Court: Sustained. We've already talked about this at side bar. Follow the Court's admonitions.

"By Ms. Watson: You're facing life without possibility of parole?" App. to Pet. for Cert. 30–31.

At that point, Judge Pounders called counsel to the bench. The judge asked respondent why he should not hold her in contempt for discussing punishment after he had "at least twice ordered counsel not to cover" the issue. Respondent replied, "I think it goes to [Mora's] state of mind as to why he would take this risk at this point in revealing that he was the person who called 911." When the judge asked why respondent did not raise the point at sidebar, particularly when her co-counsel Gutierrez had been admonished for raising the issue, Watson responded: "I wasn't at side bar with any of that involving Mr. Gutierrez . . . ." The judge said, "You're in violation of a court order. You do not think that's relevant to anything?" Watson responded, "I didn't think it was." *Id.*, at 31, 32.

Judge Pounders then found respondent in contempt for violating Cal. Civ. Proc. Code Ann. § 1209(a)(5) (West 1997), which provides that "[d]isobedience of any lawful judgment,

order, or process of the court" is grounds for contempt. The next day, on June 22, the judge issued a written order of contempt finding that "the questions asked by contemnor of Defendant Mora in the presence of the jury had as its *[sic]* sole purpose improperly advising the jury of the potential penalty for the defendants in violation of the court order." App. to Pet. for Cert. 26. He found "contemnor was aware of the Order," since she was

> "at all times . . . present (a) at or immediately adjacent to all side bar conferences and (b) present in open court on April 7, 1994, when the initial warning was given, and (c) on April 20, 1994, when the warning was repeated in open court, and (d) on April 21, 1994, when co-counsel Mr. Gutierrez apologized in open court for defying that same order." *Ibid.*

The court imposed a 2-day jail sentence to be served after trial.

On July 8, two days after the murder case was submitted to the jury, Judge Pounders gave respondent another opportunity to justify her actions. She again explained and argued through her counsel that she thought her questions were relevant and " 'not covered by the court's previous rulings or admonitions.' " 102 F. 3d, at 436. Judge Pounders was not convinced. Respondent, he noted, did not ask for a side bar for clarification. He found:

> " 'I think she has permanently prejudiced this jury in favor of her client. . . . They know the penalty he's facing . . . and they know that the person that was killed [a gang member] isn't worth that penalty, and so they are not going to find him guilty of the major charge.
>
> .        .        .        .        .
>
> " 'And when the penalty is as extreme as this one is presented to the jury, I think that's a prejudice that cannot be overcome. . . .

. . . . .

> "'And I believe that the result is going to be that [the jury] will not find Mr. Mora guilty of the main offense, which is murder, that they may not find him guilty of much at all.'" *Ibid.*

Respondent's habeas petitions to the California Court of Appeal and the California Supreme Court were denied summarily. She filed this federal habeas corpus action in the United States District Court for the Central District of California. The District Court denied the petition on September 8, 1994, finding "[t]he record makes it quite clear that multiple statements made in open court gave Petitioner adequate warning to put a person of reasonable intelligence on notice as to what conduct Judge Pounders had prohibited, satisfying due process notice requirements." App. to Pet. for Cert. 15.

Respondent appealed to the United States Court of Appeals for the Ninth Circuit, arguing that her due process rights were violated because she did not have notice of the prohibited conduct and because the trial judge could not have known without a hearing whether her conduct was willful. The Court of Appeals did not dispute the state trial court's findings on these points. Instead, it held that "her conduct was not so disruptive as to justify use of summary contempt procedure," 102 F. 3d, at 437.

Longstanding precedent confirms the power of courts to find summary contempt and impose punishment. See, *e. g.,* *Ex parte Terry,* 128 U. S. 289 (1888). In *Cooke* v. *United States,* 267 U. S. 517 (1925), the Court said:

> "To preserve order in the court room for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court when occurring in open court. There is no need of evidence or assistance of counsel before punishment, because the court has seen the of-

fense. Such summary vindication of the court's dignity and authority is necessary. It has always been so in the courts of the common law and the punishment imposed is due process of law." *Id.,* at 534–535.

As we have recognized, however, the contempt power may be abused. We have held the summary contempt exception to the normal due process requirements, such as a hearing, counsel, and the opportunity to call witnesses, "includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court, and where immediate punishment is essential to prevent 'demoralization of the court's authority' before the public." *In re Oliver,* 333 U. S. 257, 275 (1948) (quoting *Cooke, supra,* at 536).

We have stressed the importance of confining summary contempt orders to misconduct occurring in court. Where misconduct occurs in open court, the affront to the court's dignity is more widely observed, justifying summary vindication. See *In re Green,* 369 U. S. 689, 692 (1962) (relying on due process cases); *Harris* v. *United States,* 382 U. S. 162, 164 (1965) (defining boundary between summary and ordinary contempt under Fed. Rule Crim. Proc. 42).

*United States* v. *Wilson,* 421 U. S. 309 (1975), sheds light on the case before us. In *Wilson,* the prosecution called two witnesses who, in open court, refused to testify. The United States District Court granted immunity and ordered them to answer. The witnesses still refused, and the court summarily held them in contempt. We noted that although the witnesses' refusals to testify were "not delivered disrespectfully," *id.,* at 314, their conduct nevertheless justified summary contempt under Rule 42(a). It was not intimated that the contempt convictions there violated due process. "The face-to-face refusal to comply with the court's order itself constituted an affront to the court, and when that kind of refusal disrupts and frustrates an ongoing proceeding, as it

did here, summary contempt must be available to vindicate the authority of the court . . . ." *Id.*, at 316. Even the dissent suggested contempt convictions would have been warranted if the witnesses had engaged in "'insolent tactics.'" *Id.*, at 326 (Brennan, J., dissenting) (quoting *Harris, supra,* at 165).

In this case the state trial court made an express finding that respondent willfully refused to comply with the court's order. Again and again the trial court admonished counsel, both in open court and at bench conferences when respondent was sitting a few feet away, not to discuss punishment. After respondent asked her client whether he had been facing the death penalty, the court sustained an objection and said: "'We've already talked about this at side bar. Follow the Court's admonitions.'" App. to Pet. for Cert. 24. Undaunted, respondent's next question was, "'You're facing life without possibility of parole?'" *Id.*, at 25.

The Court of Appeals did not question the willfulness finding in its opinion. 102 F. 3d, at 438 ("[W]e do not decide the issue whether Ms. Watson willfully disobeyed a court order"). Instead, the Court of Appeals held her conduct was not sufficiently disruptive because she herself "did not engage in a pattern of repeated violations that pervaded the courtroom and threatened the dignity of the court" and because the record did not indicate she would have repeated the references to punishment unless she were held in summary contempt. *Ibid.*

All that is before us is the ruling that respondent's conduct was not disruptive enough to justify contempt, and on this issue we are in disagreement with the Court of Appeals. Nothing in our cases supports a requirement that a contemnor "engage in a pattern of repeated violations that pervaded the courtroom," *ibid.*, before she may be held in summary contempt. To the contrary, in *Wilson,* the summary contempt convictions were upheld after a single refusal to give immunized testimony, "not delivered disrespectfully." 421

U. S., at 314. We nevertheless held that the conduct there "disrupt[ed] and frustrat[ed] an ongoing proceeding." *Id.*, at 316. And we have not required that a court determine a contemnor would have repeated the misconduct but for summary punishment. While we have approved, in the context of reviewing a federal contempt order, the equitable principle that only "'the least possible power adequate to the end proposed' should be used in contempt cases," *id.*, at 319 (quoting *Anderson* v. *Dunn*, 6 Wheat. 204, 231 (1821)), we found that principle satisfied in the circumstances in *Wilson* because, during an ongoing trial, the court is justified in acting swiftly "to prevent a breakdown of the proceedings." 421 U. S., at 319. Likewise, in *Sacher* v. *United States*, 343 U. S. 1, 5 (1952), the Court upheld summary contempt convictions of counsel where the misconduct had the following characteristics: "It took place in the immediate presence of the trial judge; it consisted of breaches of decorum and disobedience in the presence of the jury of his orders and rulings upon the trial; the misconduct was professional in that it was that of lawyers" and conviction was based "upon a course of conduct long-continued in the face of warnings that it was regarded by the court as contemptuous." See also *Groppi* v. *Leslie,* 404 U. S. 496, 506 (1972). Cf. *Illinois* v. *Allen,* 397 U. S. 337, 343 (1970) ("We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case").

Here the trial court expressly found that respondent's questions had "permanently prejudiced the jury in favor of her client" and that the prejudice "cannot be overcome." The Court of Appeals glossed over the state-court finding, saying "we can understand Judge Pounders' concern that her two questions *might* prejudice jurors in favor of her client," 102 F. 3d, at 438 (emphasis added). Seriously prejudicing the jury is comparable in terms of damage to the administration of justice to the refusals to testify in *Wilson.* The trial court's finding that respondent's comments had prejudiced

the jury—together with its assessment of the flagrance of respondent's defiance—support the finding of the need for summary contempt to vindicate the court's authority.

While the Due Process Clause no doubt imposes limits on the authority to issue a summary contempt order, the States must have latitude in determining what conduct so infects orderly judicial proceedings that contempt is permitted. As we have noted, we have used various phrases to describe the type of conduct required. We need not explore these limitations and standards, however, for the conduct of counsel here was well within the range of contumacious conduct disruptive of judicial proceedings and damaging to the court's authority. Advocacy that is "fearless, vigorous, and effective," *Sacher, supra,* at 13, does not extend to disruptive conduct in the course of trial and in knowing violation of a clear and specific direction from the trial judge.

On the record before us, the Court of Appeals was in error. It was error for the Court of Appeals to rule, as a matter of law, that the contempt order went beyond those necessities pertaining to the ordered administration of justice. The ruling of the Court of Appeals, not reviewed en banc, introduced uncertainty into routine proceedings of the many state courts within the Court of Appeals' large geographical jurisdiction. The judgment is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE BREYER joins, dissenting.

As the Court correctly explains, the record supports the conclusion that respondent defied a court order when she asked two questions about her client's potential punishment. I assume, therefore, that she acted in contempt of court. The record also demonstrates, however, that no further misconduct or disruption of the trial occurred. The question the Court of Appeals addressed was whether these circumstances justified a summary contempt proceeding conducted by the judge before whom the contempt occurred. I do not

agree with the Court that the answer to this question is so clear as to justify summary reversal.

In the majority of the cases relied on by the Court, the summary contempt power was invoked to punish conduct that threatened to disrupt the court's ongoing proceedings. See, e. g., *United States* v. *Wilson*, 421 U. S. 309 (1975). A more substantial question arises when the summary contempt proceeding is not invoked to prevent disruption of the trial, but to punish action that has already occurred. As Justice Frankfurter recognized in his dissenting opinion in *Sacher* v. *United States*, 343 U. S. 1 (1952), concerns about the adequacy of procedural safeguards are heightened in cases involving summary contempt procedures:

> "Summary punishment of contempt is concededly an exception to the requirements of Due Process. Necessity dictates the departure. Necessity must bound its limits. In this case, the course of events to the very end of the trial shows that summary measures were not necessary to enable the trial to go on. Departure from established judicial practice, which makes it unfitting for a judge who is personally involved to sit in his own case, was therefore unwarranted. . . .
>
> "This, then, was not a situation in which, even though a judge was personally involved as the target of the contemptuous conduct, peremptory action against contemnors was necessary to maintain order and to salvage the proceedings. Where such action is necessary for the decorous continuance of a pending trial, disposition by another judge of a charge of contempt is impracticable. Interruption for a hearing before a separate judge would disrupt the trial and thus achieve the illicit purpose of a contemnor." *Id.*, at 36–37, 39.

We recognized these limits to a court's summary contempt power in *In re McConnell*, 370 U. S. 230 (1962), where we granted plenary review and set aside a $100 contempt sanc-

tion for conduct that was more disruptive (although arguably more justified) than what occurred in this case.* We emphasized:

> "To preserve the kind of trials that our system envisages, Congress has limited the summary contempt power vested in courts to the least possible power adequate to prevent actual obstruction of justice, and we think that that power did not extend to this case." *Id.,* at 236.

Given that the respondent in this case asked two inappropriate questions over the course of a three and a half month long trial and that the trial continued without incident for two weeks after her contemptuous conduct, a substantial question exists as to whether fair procedure required a hearing before another judge. Neither the Court nor the petitioner contends that this summary contempt power was exercised to prevent the "actual obstruction of justice," such that a hearing before an entirely disinterested judge would have been impractical. Because I believe that these questions are important and not clearly answered by our precedents—indeed, the Court does not cite a single case that is at all comparable to this one on its facts—it is unwise to answer it without full briefing and argument.

Accordingly, I respectfully dissent.

---

*In *McConnell,* the judge had erroneously ruled that plaintiff's counsel could not try a charge of conspiracy, holding that he must do so in a separate trial. To preserve his client's rights on appeal, counsel persisted in asking questions in the presence of the jury regarding the conspiracy charge. Counsel then refused to obey the judge's order to stop asking the questions, and stated that he would continue to do so unless stopped by the bailiff. After a recess, plaintiff's counsel returned to trial and asked no more forbidden questions. Following trial, and after holding a hearing, the trial judge summarily found counsel guilty of contempt and imposed a jail sentence. On appeal, the Court of Appeals sustained the convictions, but reduced the sentence to a fine of $100.