[No. 32522-5-II.   Division Two.   December 5, 2006.]

THE STATE OF WASHINGTON, *Respondent*, v. MARK EDWARD BERTY, *Defendant*, STONE D. GRISSOM, *Appellant*.

*Barbara L. Corey*, for appellant.

*Russell D. Hauge, Prosecuting Attorney,* and *Randall A. Sutton, Deputy,* for respondent.

¶1 PENOYAR, J. — Attorney Stone Grissom appeals contempt sanctions that the trial court imposed for his conduct

while representing Mark Berty on voyeurism charges. Grissom contends that the trial court erred in relying on its inherent contempt power rather than initiating contempt under the criminal contempt statute. He also claims that he did not commit misconduct as a matter of law. We hold that the trial court properly exercised its discretion to impose sanctions for contempt committed in the court's presence, but that the amount of sanctions imposed was excessive. We affirm but remand for entry of an order consistent with this opinion.

## FACTS

### I. BACKGROUND

¶2 Attorneys Stone Grissom and Ann Stenberg[1] defended Mark Berty on charges of voyeurism. According to the sheriff's report, Berty's 16-year-old daughter, R.H.B., told her mother, Symphony[2] (Berty's wife), that Berty watched R.H.B. through a hole in the sheet rock ceiling as R.H.B. showered. The defense theory was that Symphony was unhappy with the marriage, suffered from mental health problems, and coerced R.H.B. into fabricating the charges so she could get out of the marriage and get custody of the children.

### II. PRETRIAL MOTIONS

¶3 Before trial, the State filed motions in limine to prohibit references to any counseling, mental health or otherwise, sought by any of the witnesses and to prohibit references to Symphony's or Berty's childhood. The defense, through attorney Stenberg, argued that Symphony's history was relevant to her motive or bias. The court granted the State's motions but said it would revisit the issue if the defense presented a memorandum with authority showing

---

[1] Because the attorneys' conduct is at issue, we specify which attorney made which comments where it is relevant.

[2] We use Symphony Berty's first name in this opinion to avoid confusion. We mean no disrespect.

the testimony was admissible. The State later claimed in its motions for sanctions that defense counsel never provided any such authority, and none is apparent in the record on appeal. Grissom responded that he did cite an authority during sidebar, but the sidebar is not included in the record.

¶4 The defense brought a motion in limine to exclude any reference to Berty's prior arrests or alleged crimes; any reference to Berty's reputation for criminal conduct; and any reference to Berty's bad temper, criminal disposition, or reputation for domestic violence. The State agreed, and the court granted the motion.

¶5 Also during pretrial motions, the State asked the trial court to exclude any reference to "the defendant's life is in your hands" or similar arguments because they are a plea for sympathy. 1 Report of Proceedings (RP) at 38. Stenberg acknowledged that specific references to sentences would not be appropriate but stated that the defense should be able to argue that the State has the highest standard of proof because "a person's liberty interests are at stake." 1 RP at 41. The trial court limited all references to what is at stake but stated: "[I]f you give me authority or a case that is on point for this issue . . . I will gladly reconsider my ruling on that." 1 RP at 41.

¶6 During voir dire, Grissom informed the court that he would like to speak about reasonable doubt, the constitution, and the presumption of innocence. The court replied that he was treading on "interesting ground" and that it would wait and "watch how it happens." 3 RP at 184-85. Stenberg then brought a motion for mistrial or a stay of proceedings to appeal "given the Court's rulings on limitations placed in voir dire." 3 RP at 185. The court ordered defense counsel to present their objections in writing.

III. TRIAL

A. R.H.B.'s Cross-Examination

¶7 The State called R.H.B. as a witness. On cross-examination, Grissom asked R.H.B. if Berty was strict. The following exchange took place:

Q: And strict meaning he wouldn't let you watch PG-13 movies before you were 13, he wouldn't let you—

A: Yes. He was controlling.

Q: Well, controlling—

A: Yes.

Q: You said to me in the interview that he was strict in a good way?

A: In certain ways, yes.

Q: Okay. And, in fact, I believe your mom used the word controlling?

A: Yes.

Q: Isn't that right?

A: I believe. I don't know actually.

Q: Is that why you are using the word "controlling," because your mom told you that that's what he was?

A: No. I saw my dad as controlling.

4 RP at 266-67.

¶8 R.H.B. admitted during cross-examination that she briefly discussed some of her pretrial interview testimony with her mother, even though she had been instructed not to do so. Grissom then questioned R.H.B. about an incident that took place after court the previous day in which R.H.B.'s uncle chased her father (the defendant). The State objected to this line of questioning, and the court called a sidebar. During the sidebar, the State claimed that it had no notice of any chasing incident, and no notice that defense counsel would present it in cross-examination. The court responded that it expected counsel to inform each other of any such misconduct and that it would not allow Grissom to continue this line of questioning.

¶9 Grissom then moved for a mistrial, claiming, "I think Your Honor has now shown that he has been completely biased against my client. Every single ruling has been now made in the side of the State." 4 RP at 311-12. Grissom further stated, "And now I can't even talk about impeach-

ment. . . . I am under no obligation, no obligation whatsoever, to give any impeachment evidence. It's previewing my case. If [the State] can't prepare her case and know all the stuff about her witnesses, then that's to her detriment." 4 RP at 312. The court denied the motion for mistrial.

¶10 Later, when the court excluded testimony from Berty's mother, Stenberg placed a "very sincere objection" on the record, saying that the court "with all of its rulings, has very, very drastically limited our ability to present our case." 5 RP at 341.

## B. Symphony's Cross-Examination

¶11 During Symphony's cross-examination, Grissom asked, "Isn't it true that you wanted out of this relationship and this was your chance?" 5 RP at 393. Symphony replied, "No." 5 RP at 393. Grissom later asked Symphony, "Isn't it true that you thought of your husband as someone who was controlling?" 5 RP at 404. The State objected and the court sustained. Grissom requested a sidebar, which the court denied, stating, "We have discussed this sufficiently at sidebars already." 5 RP at 404.

¶12 Grissom then responded, "No, we have not discussed this at sidebar. I would request a sidebar; otherwise, I would request that the jury be excused and I can make a record. . . . This witness has now lied under oath and I want . . . ." 5 RP at 404. The State objected, and the court struck the comment, stating, "Counsel, you know better than such allegations. I think you are doing something for other motives." 5 RP at 404.

¶13 At a sidebar, the State moved for sanctions. Grissom claimed that Symphony stated in a pretrial interview that she was happy in her marriage and that he was trying to impeach her. After hearing arguments from both sides, the court addressed Grissom:

> Your conduct throughout the trial, while clearly zealous, at times, in my opinion, has come very close to crossing over the

line, and your comment at the last occasion crossed over it. However, I am not going to find summary contempt for your behavior or issue sanctions as the prosecution is requesting.

I am concerned that the behavior may be calculated to create a mistrial. . . . You're on the edge of sanctions right now.

5 RP at 411. The court allowed Symphony to answer the question about whether she believed her husband was controlling but limited it to that. Symphony testified that she did see Berty as controlling.

### C. Closing Arguments

¶14 During closing arguments, the State asked the jury, "Can you imagine what motive Symphony would have to have to lie about this?" 6 RP at 578. In response, Grissom argued:

What possible motive would Symphony Berty have to charge her husband? What possible motive? Did you hear the State say that? What possible motive would she have? Well, you saw hints of it. I wish I could tell you all of the motives, but you heard hints.

6 RP at 580. A little later, Grissom stated: "What did Symphony tell you? Symphony told you at first that she was happy in her relationship, happy in her marriage. Then she had to backtrack a little bit. I even had to go so far as to say she wasn't telling the truth." 6 RP at 591. The State objected and the court sustained the State's objection.

¶15 Outside the jury's presence, the State renewed its motion for sanctions. After hearing arguments, the court stated:

Here's what I'm going to do. The words of the two comments that are of concern to the Court are not entirely reflective of the inflections and tonality of how the words were said. That's what concerns me more than anything. I think the inflection of how and the way in which [Grissom] said it, "I wish I could," . . . I heard it said with the thing "I know something you don't know and I wish I could tell you." That's how I heard it.

6 RP at 597. The court then took a recess to review the record as to what Grissom had stated about Symphony's not telling the truth. The court later declared, "The other comment was concerning a happy marriage. . . . My brief review of the record establishes that there was no confrontation of suggesting she wasn't telling the truth about that subject." 6 RP at 601.

¶16 The court went on to conclude: "I'm not going to declare a mistrial because I believe curative instructions can cure what has occurred. However, I am going to set a sanctions hearing after this case is resolved for the totality of the conduct that has occurred in this case by defense counsel." 6 RP at 601. The court then allowed Grissom to proceed with closing arguments.

¶17 The jury acquitted Berty of voyeurism.

IV. SANCTIONS HEARING

¶18 About two months after trial ended, the State filed its motion for sanctions. The motion recited the facts and specified the two instances where the State had moved for sanctions.

¶19 At the sanctions hearing, the court found that "the State's rendition of the relevant events in this certificate [was] accurate and incorporate[d] same into its findings and conclusions." RP (Nov. 5, 2004) at 2.

¶20 The court went on to conclude:

> The Court has decided to proceed under its inherent authority rather than under the statutory contempt scheme. The summary contempt statute is inadequate. RCW 7.21.050 requires that sanctions occur immediately after contempt and limits fines to $500 for each contempt. In light of a long pattern of conduct throughout the trial, delaying the sanctions hearing in this case was necessary to obtain the record to ensure that the Court's memory was accurate, and, in the Court's opinion, the attorney's conduct likely warrants a greater fine than $500.

RP (Nov. 5, 2004) at 2-3. The court also found that Grissom knew his conduct was impermissible.

¶21 After reading the facts from the State's motion, the court stated:

> Attorney Grissom's behavior was disrespectful of the Court's authority and an affront of [sic] its dignity. Immediate sanctions for the reasons stated previously, however, were not necessary to preserve the authority of the Court at that moment, although the issue was very close to the Court's decision. Immediate sanctions at that point, given the large pattern of behavior of the entire trial and the Court wishing to be abundantly clear that it was appropriate at this point, given the behavior, it was better felt to delay sanctions to give an opportunity for the record to be completed and also to review the applicable standards that apply.
>
> The Court concludes beyond a reasonable doubt that Attorney Grissom's conduct was willful and intentional.
>
> At this point, however, I wish to give Attorney Grissom an opportunity to respond to these findings and attempt to mitigate what the Court has observed.

RP (Nov. 5, 2004) at 12-13.

¶22 Grissom explained that he had interviewed Symphony several times, including shortly before her testimony at trial, and speculated that he had confused his interview with testimony she gave on the stand. He claimed that he did not willfully disobey the court's order but believed he was zealously advocating for his client. He apologized if the court found he was working outside of the rules.

¶23 The State argued that Grissom's actions affected the trial outcome and asked that he be sanctioned $4,297.59, the amount the county paid for the trial. The court concluded that Grissom's behavior did not compromise the outcome but rather that the prosecution was "undercut by some very sloppy police work." RP (Nov. 5, 2005) at 20. For this reason, he did not impose sanctions in the amount the State requested. The court informed Grissom that it was sanctioning him for two comments he made in closing: (1) the comment that "I wish I could tell you" about Symphony's motives and (2) the comment that Symphony was not

telling the truth. RP (Nov. 5, 2004) at 11-12, 20. The court imposed a $750 fine for each comment.

¶24 When Stenberg asked about filing an information through the prosecutor's office, the court responded that this was not a summary contempt but, rather, was coming under the court's "inherent summary contempt power." RP (Nov. 5, 2004) at 22.

¶25 The order of contempt incorporated the State's certificate by reference. The order specified that the court informed Grissom that his conduct was impermissible but Grissom's behavior remained "disrespectful of the Court's authority and an affront to its dignity." Clerk's Papers (CP) at 63. It stated that Grissom was "advised that his conduct was sanctionable, and that he had cross[ed] the line for summary contempt and that a sanctions hearing would follow." CP at 63. The order did not specifically describe which of the instances of alleged misconduct warranted sanctions. However, the order included the conclusion that sanctions were necessary "to preserve order in the Court and to protect the authority and dignity of the Court." CP at 64.

## ANALYSIS

I. CONTEMPT

¶26 Grissom argues that the trial court erred when it relied on its inherent contempt power, claiming that the trial court should have instead initiated contempt under the criminal contempt statute, as its actions were punitive. The State responds that the trial court's actions in summarily finding Grissom in contempt were a proper exercise of its inherent contempt power. We agree with the State.

¶27 A finding of contempt and punishment, including sanctions, lies within the trial court's sound discretion, and we will not disturb such findings and sanctions absent an abuse of that discretion. *State v. Dugan*, 96 Wn. App. 346, 351, 979 P.2d 885 (1999). A trial court abuses its

discretion when it exercises it in a manifestly unreasonable manner or bases its decision on untenable grounds or reasons. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995).

¶28 A finding of contempt will be upheld as long as a proper basis can be found. *State v. Hobble*, 126 Wn.2d 283, 292, 892 P.2d 85 (1995) (quoting *State v. Boatman*, 104 Wn.2d 44, 46, 700 P.2d 1152 (1985)). The authority to impose sanctions for contempt may be statutory or under the inherent power of constitutional courts. *Hobble*, 126 Wn.2d at 292.

¶29 Contempt can be either civil or criminal, with the latter requiring the constitutional safeguards extended to other criminal defendants. *In re Marriage of Didier*, 134 Wn. App. 490, 500, 140 P.3d 607 (2006) (citing *In re Interest of M.B.*, 101 Wn. App. 425, 438-40, 3 P.3d 780 (2000)). The current Washington statutes on contempt define contemptuous conduct but, unlike previous versions of the statute, do not distinguish between civil and criminal contempt. *Hobble*, 126 Wn.2d at 292. Instead, current statutes distinguish between punitive and remedial sanctions for contempt. *Didier*, 134 Wn. App at 500; RCW 7.21.010, .030, .040. A "punitive sanction" is "a sanction imposed to punish a past contempt of court for the purpose of upholding the authority of the court." RCW 7.21.010(2). A "remedial sanction" is "a sanction imposed for the purpose of coercing performance when the contempt consists of the omission or refusal to perform an act that is yet in the person's power to perform." RCW 7.21.010(3).

¶30 Both the remedial and punitive sanctions statutes contain an exception to compliance with their provisions, if the contempt falls within the provisions of RCW 7.21.050. *Hobble*, 126 Wn.2d at 293. Both punitive and remedial sanctions are authorized for direct contempt—a presiding judge "may summarily impose either a remedial or punitive sanction . . . upon a person who commits a contempt of court within the courtroom if the judge certifies that he or she saw or heard the contempt." RCW

7.21.050(1). The judge may impose such contempt sanctions at the end of the proceeding, and sanctions are permitted only "for the purpose of preserving order in the court and protecting the authority and dignity of the court." RCW 7.21.050(1).

¶31 Under the plain language of the contempt statute, the trial court's imposition of sanctions in this case was proper. The judge summarily imposed punitive sanctions on Grissom due to his contempt within the courtroom. The judge certified that he saw the contempt when he notified Grissom during closing argument that his (Grissom's) comments were sanctionable. The judge was permitted to wait to impose sanctions until the end of the proceeding, and substantial evidence supports the court's finding that the sanctions were necessary to preserve order in the court and protect the authority and dignity of the court. The trial court did not abuse its discretion by imposing these sanctions, and we accordingly affirm.

¶32 Grissom argues that the court's inherent power to find contempt "generally is limited to immediate action." Appellant's Br. at 14. The court did state that it was using its "inherent summary contempt power," but its actions were authorized by the summary contempt statute. However, an appellate court may sustain a trial court on any correct ground, even if that ground was not considered by the trial court. *Nast v. Michels*, 107 Wn.2d 300, 308, 730 P.2d 54 (1986); *see also State v. Winings*, 126 Wn. App. 75, 88, 107 P.3d 141 (2005). The summary contempt statute specifically allows a court to impose sanctions after the proceeding, so Grissom's argument is without basis.

¶33 While imposition of sanctions was proper in this case, RCW 7.21.050 also contains a limit on the amount a court may fine a contemnor. A court "may impose for each separate contempt of court a punitive sanction of a fine of not more than five hundred dollars." RCW 7.21.050(2). In this case, the court imposed a $750 fine for each of two incidents of contempt, which statutory law does not allow. Therefore, while we affirm the imposition of sanctions

against Grissom, we reduce the amount of sanctions to $500 per incident, for a total fine of $1,000.

## II. Counsel's Conduct

¶34 Grissom also argues that his conduct did not constitute misconduct as a matter of law. The State responds that this claim has no merit because his comments during closing were clearly improper, especially in light of the court's prior warnings.

■■ ¶35 "Contempt of court" includes (1) intentional "[d]isorderly, contemptuous, or insolent behavior toward the judge . . . , tending to impair its authority . . . " or (2) intentional "[d]isobedience of any lawful judgment, decree, order, or process of the court." RCW 7.21.010(1)(a)-(b). Repeated violations of court rules can rise to contumacious conduct, especially when an attorney violates a court's instructions not to pursue a particular line of questioning. *See Pounders v. Watson*, 521 U.S. 982, 989-91, 117 S. Ct. 2359, 138 L. Ed. 2d 976 (1997).

¶36 Here, the trial court cited two instances where Grissom disobeyed the court's rulings regarding questioning of Symphony, both of which occurred during Grissom's closing argument: (1) his statement that he wished he could tell the jury "all of the motives" Symphony may have had to lie during her testimony and (2) stating, "I even had to go so far as to say she wasn't telling the truth." 6 RP at 580, 591.

¶37 Both of these instances are clear examples of Grissom's violating the trial court's order and unequivocally flouting its authority. Consequently, we reject Grissom's argument that this behavior somehow did not constitute contempt.

¶38 Affirmed; remanded for entry of an order reducing the sanctions amount consistent with this opinion.

HOUGHTON, C.J., and BRIDGEWATER, J., concur.