DECISION AND JUDGMENT ENTRY
{¶ 1} Appellant appeals a contempt of court adjudication entered in the Ottawa County Court of Common Pleas. For the reasons that follow, we affirm.
 {¶ 2} In 2001, appellant, Elsebeth Baumgartner, sued a former member of the Benton-Carroll-Salem School Board for what she characterized as a civil assault. The board member interposed a counterclaim, alleging that appellant had defamed him. *Page 2 
 {¶ 3} In January 2004, following the recusal of four prior judges on the case, the Chief Justice of the Supreme Court of Ohio appointed retired Judge Richard M. Markus to the case. Judge Markus presided over the case to its completion in December 2004. Appellant's claim was eventually dismissed. The school board member ultimately prevailed on the counterclaim.
 {¶ 4} On December 10, 2004, contemporaneous with the court's final judgment on the merits, Judge Markus filed an "Opinion and Order for Criminal Contempt Citation." In this document, Judge Markus enumerated 32 separate statements contained in eight documents filed with the court by appellant during the course of the litigation. These statements, he concluded, constituted, "* * * repeatedly contemptuous conduct [which] brought the administration of justice into disrespect, with wildly unjustified verbal attacks on adverse counsel and each judge, which tended to embarrass, impede, and obstruct the court in the performance of its function."
 {¶ 5} The court quoted statements from the documents filed:
 {¶ 6} "I. On August 13, 21004, [sic] Elsebeth Baumgartner filed a document with the Ottawa County Court of Common Pleas Clerk of Court, in which she stated:
 {¶ 7} "A. ¶ 3. `On or about January 22, 2004, Richard Markus of faraway Fairview Park Ohio a retired judge ordinarily assigned to the Cuyahoga County Common Pleas Court appeared in a secret pre-trial hearing in case no 02CVH025 without appointment to the case claiming he had been appointed to [sic] Chief Justice Moyer to *Page 3 
adjudicate all of Elsebeth Baumgartner's cases. Later, Chief Justice Moyer filed a back dated assignment notice in the case.'
 {¶ 8} "B. ¶ 6 `On May 27, 2004, Richard Markus appeared for the first scheduled pre-trial in this case even though he's been served with an Affidavit of Bias and Prejudice which stay the proceedings. After an ex-parte discussion with Chief Justice Moyer, Richard Markus proceeded with the stayed pre-trial conference set a trial date and failed to provide counterclaim defendants with any record of the pretrial.'
 {¶ 9} "II. On September 3, 2004, Elsebeth Baumgartner filed a document with the Ottawa County Common Pleas Clerk of Court, in which she stated:
 {¶ 10} "A. `Elsebeth Baumgartner would like an explanation from Judge Markus for his apparent negligence in supervision of the conduct of court officers in this case and how he expects her to prepare for trial.'
 {¶ 11} "B. `Instead of recognizing the egregious harassment presented by subpoening [sic] a stranger to the case on one day Notice, Judge Markus rewards bad behavior by ultimately giving Steve Mosier [adverse counsel] something to which he is not entitled, namely a fishing expedition with a witness who knows nothing about this case. Judge Markus accomplishes this by ignoring his published book opting instead for Mr. Mosier's tortured use of the Federal Rules of Civil Procedure. Further, Judge Markus provides no clue for the basis of his authority in ordering a stranger to the case to be deposed for 6 hours, at a time and place set by the judge after apparently checking first with Mr. Mosier via an ex-parte communication.' *Page 4 
 {¶ 12} "III. On September 24, 2004, Elsebeth Baumgartner filed a document with the Ottawa County Common Pleas Clerk of Court, in which she stated:
 {¶ 13} "A. `Counterclaim Defendant includes herein a list of Objections specifying misleading and false statements by Judge Markus that leads to the very strong appearance of his being bribed in this case.'
 {¶ 14} "B. ¶ 8. `Steve Mosier [adverse counsel] and Kellen Smith [counterclaim plaintiff] committed the crime of falsification by continuing to mislead the Sixth District Court of Appeals by claiming they needed discovery in order to file a libel case when in fact they had already filed a libel case . . .'
 {¶ 15} "C. ¶ 11. `The history of the misconduct of both attorneys and judges in this case was set forth in a Motion to Quash Deposition Notice of Jeff McConnell [written and filed by Elsebeth Baumgartner] and is again set forth below.'
 {¶ 16} "D. ¶ 14. `On or about January 27, 2004 elderly Richard Markus of faraway Fairview Park Ohio a retired judge appeared at a secret pretrial hearing in case no 02CVH025 without appointment to the case claiming he had been appointed to [sic] Chief Justice Moyer to adjudicate all of Elsebeth Baumgartner's cases.'
 {¶ 17} "E. ¶ 19. `In a letter sent by Attorney John Schneider [one of Elsebeth Baumgartner's previous counsel in this case], he mis-represented that Judge Markus orally approved their withdrawal in this case prior to a pre-trial and without transfer of the filed [sic] sometime between March 2004 and March 22, 2004. This is a false statement because Judge Markus was in South Africa during this time frame and certainly *Page 5 
not attending to his judicial duties. Of course this is easily disproven by the Clerk producing a copy of the fax transmission of the Withdrawal motion to South Africa and some authority in law that permits a retired visiting judge to preside over cases while in a foreign country.'
 {¶ 18} "F. ¶ 21 `On May 27, 2004, Richard Markus appeared for the first scheduled pretrial in this case even though he'd been served with an Affidavit of Bias and Prejudice that stayed the proceedings. After an ex parte discussion with Chief Justice Moyer, Richard Markus proceeded with the stayed pretrial conference, set a trial date and failed to provide counterclaim defendants with any record of the pretrial.'
 {¶ 19} "G. ¶ 22. `The Cleveland Plain Dealer recently reported that a judge responds to an Affidavit of Bias and Prejudice 7 days after filing after which Chief Justice Moyer ruled on the merits. . . . Judge Markus does not seem to understand procedure.'
 {¶ 20} "H. ¶ 25. `On or about July 28, 2004, Judge Moon reentered this case by filing an entry denying a jury trial.'
 {¶ 21} "¶ 26. `Judge Markus now fraudulently suggests that he approved the entry of the administrative judge in this case on a temporary basis even though there is no written record and he has no authority to approve anything the Judge Moon does.'
 {¶ 22} "I. ¶ 27. `During the July and August 2004, Counterclaim Defendant Elsebeth Baumgartner engaged in communications with Attorney Richard Markus . . .' *Page 6 
 {¶ 23} "J. ¶ 37. `Counterclaim defendant requested a protective order in her motion but as has become the practice of Judge Markus, he failed to follow the Rules of Civil Procedure and never rules on Motions to Quash.'
 {¶ 24} "K. ¶ 38. `Instead in an entry dated Augsut [sic] 25, 2004 he misrepresented the date of Jeff McConnell's scheduled deposition as August 16, 2004 in a disingenuous effort to grant Mr. Mosier's Motion for Reconsideration of his decision quashing Mr. McConnell's deposition dated August 16, 2004 while at the same time fabricating evidence to support Mr. Mosier's pending false Motion for Default Judgment.'
 {¶ 25} "L. ¶ 42. `Judge Markus represents that counsel informed both herself and Cleveland Genomics, Inc. at a nonexistent pretrial scheduled for January 22, 2004. If Judge Markus had only recorded pre-trials as he should he could prove that this happened but given that the docket reflects there was no pretrial, Judge Markus appears to be delusional.'
 {¶ 26} "M. ¶ 43. `What more can this Christian woman expect from Judge Markus? Perhaps he intends to tie her up and torture her to death, all to be filmed of course for the viewing pleasure of his misogynistic master Tom Moyer. After all there isn't much more of the mob can do to silence this lady about racketeering in the courts.'
 {¶ 27} "IV. On November 24, 2004, Elsebeth Baumgartner filed a document with the Ottawa County Common Pleas Clerk of Court, which she stated:
 {¶ 28} "A. `The Ottawa County Municipal Court contains secret records in a unnumbered case file directly related to this case. Those documents prove a pattern of *Page 7 
denying access to the courts as well as equal protection of the law to women, children and my minorities in Ottawa County in order that certain government insiders such as Kellen Smith [counterclaim plaintiff in this case] may be personally benefited. The defendant in this case [Elsebeth Baumgartner] has lived in terror and fear of her life for over 4 years after her discovery of thefts of public funds from the Benton Carroll Salem Local school district via fraudulent contracts as well as a network of politically connected insiders engaged in illegal drug and sex crimes including the abuse of children.'
 {¶ 29} "B. This defendant [Elsebeth Baumgartner] cannot prepare for trial in fear that she will be illegally incarcerated and held without hearing as before simply because the Plaintiff [Kellen Smith] and his attorney need to protect lucrative racketeering schemes.'
 {¶ 30} "C. `This defendant maintains that court officers openly fixed cases both criminal and civil in this county and elsewhere . . . This is the reason why she has been abused for 4 years, not because of what she did because of what she knows.'
 {¶ 31} "V. On December 1, 2004, Elsebeth Baumgartner filed a document entitled "Objections of Elsebeth Baumgartner, etc." with the Ottawa County Common Pleas Clerk of Court, in which she stated:
 {¶ 32} "A. `Richard Markus is not a lawfully appointed judge in the State of Ohio and these proceedings are a nullity.'
 {¶ 33} "B. `Court officers including Richard Markus and Steve Mosier have filed multiple false statements in this case.' *Page 8 
 {¶ 34} "C. `Elsebeth Baumgartner and Cleveland Genomics, Inc. were severely prejudiced by Richard Markus's allowing their counsel to withdraw without Notice in March 2004 while Richard Markus was not even in the United States.'
 {¶ 35} "D. `Current counsel Robert Lynch, confined to a wheelchair has been denied discovery and an opportunity to prepare for this trial due to hidden agenda of Richard Markus and his desire to put his personal interest and schedule above providing a fair adjudication on the merits.'
 {¶ 36} "E. `Elsebeth Baumgartner is a born again Christian of Northern European heritage subject to an illegal bench warrant. She objects to the outrageous prejudice of Richard Markus as manifested by his refusal to protect her and her witness from intimidation and to provide her with an opportunity to defend herself by access to her case files, discovery a jury trial and accommodation to her disabilities. Elsebeth Baumgartner asserts such discrimination is based on religion, gender, political views, and race due to her association with oppressed minorities such as African American Krista Harris and her Northern European ethnicity. Elsebeth Baumgartner suspects Richard Markus to be a Zionist of the belief that his people are the chosen people of God and superior to all others with the right to deprive Christians or "gentiles" of their rights especially those of Northern European heritage and or Germanic origins.'
 {¶ 37} "VI. On December 1, 2004, Elsebeth Baumgartner filed a second document entitled `Notice to the Court of Allegations, etc' with the Ottawa County Common Pleas Clerk of Court, in which she stated: *Page 9 
 {¶ 38} "A. `PLEASE TAKE NOTICE, attorneys for Kellen Smith are alleged to have filed false documents in the United States bankruptcy court for the Southern District of Florida in order to advance the harassment of Elsebeth Baumgartner by means of this lawsuit a Strategic Law Suit Against Public Participation so as to thwart inquiry into a child abuse/pornography/sex ring involving public officials, attorneys, judges and members of the Toledo Catholic Diocese.
 {¶ 39} "B `PLEASE TAKE NOTICE, Elsebeth Baumgartner objects for herself and her codefendant and employer Cleveland Genomics, Inc. that there is more than the appearance of judge shopping in this case but that in fact Richard Markus was intentionally illegally appointed to this case and all other cases by Tom Moyer to affect a pre-determined outcome.'
 {¶ 40} "C. `PLEASE TAKE NOTICE, that Richard Markus is implicated in election fund raising fraud having illegally donated money to Thomas J. Moyer, the subject of a pending criminal elections complaint set for hearing on December 17, 2004 before the Ohio Elections Commission, while employed by the Supreme Court of Ohio.'
 {¶ 41} "D. `PLEASE TAKE NOTICE, Richard Markus operated a private for-profit corporation out of his home while at the same time claiming to be a General Division Judge for the State of Ohio, (a nonexistent office not authorized by the legislature). Documents filed in this case indicate a co-mingling of his private rent a judge services with his state provided judicial services.' *Page 10 
 {¶ 42} "E. `PLEASE TAKE NOTICE, Richard Markus has filed numerous false statements of fact in this case and other cases that have been brought to the court's attention without effect.'
 {¶ 43} "VII. On December 3, 2004, Elsebeth Baumgartner filed a document with the Ottawa County Common Pleas Clerk of Court, in which she stated:
 {¶ 44} "A. ¶ 61. `Movant requests the Court take judicial notice per EVID R 201 and incorporates by reference the Complaint for Removal of Ottawa County [Prosecuting Attorney Mark Mulligan filed in the] Court of Common Pleas and directs the Court's attention that the complaint contains criminal charges that Prosecutor Mulligan conspired with Sheriff Emahiser, Judge Paul Moon, Judge John Adkins, Attorney William Connelly, Attorney Charles Burns, Attorney Timothy Braun, Attorney Lori Brown of the Supreme Court and or others to engage in corrupt activity by manipulation of court cases to protect thefts of public resources through fraudulent contract schemes and or the kidnapping of Petitioner [Elsebeth Baumgartner].'
 {¶ 45} "B. ¶ 64. `Movant suggests it is time for the Honorable Judge to demonstrate that he does not discriminate in the application of the law but protects women childrens and minorities rights every bit as zealously as he protects white males such as himself"
 {¶ 46} The Chief Justice appointed a different visiting judge to preside over the hearing on Judge Markus's contempt complaint.[1] At trial, Judge Markus testified that the *Page 11 
assertions appellant made in her pleadings were baseless and her conclusions untrue. He also opined that he believed that appellant's sole reason for interposing these assertions was to disrupt the proceedings and bring the judicial system into disrepute. He also testified that he is a Lutheran.[2]
 {¶ 47} Appellant, who is a disbarred attorney and purportedly finished first in her class at law school, represented herself. Testifying in a five hour narrative, appellant contended that she had uncovered massive corruption in various governmental areas and was being persecuted for revealing such misdeeds. She accused various public officials, including the Ottawa County Prosecuting Attorney, the Erie County Prosecuting Attorney and the Chief Justice of the Supreme Court of Ohio as participants in this persecution. Beyond her own testimony, she offered no proof as to these allegations or those which were the subject of her contempt citation.
 {¶ 48} Following the hearing, the court found appellant in contempt for 27 of the 32 citations issued. The court found that, although the statements in "Count II A and B" were "insolent" and "not effective advocacy," they were issues of legitimate inquiry. The court also declined to find contemptuous those statements contained in Count III (C), (G) and (I). At sentencing, the court imposed a $2,700 fine ($100 for each count) and 120 days incarceration (20 days for each of the six counts).
 {¶ 49} From this judgment, appellant now brings this appeal. Appellant sets forth the following eight assignments of error: *Page 12 
 {¶ 50} "I. Defendant-appellant's convictions violate due process under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section 16 of the Ohio Constitution because the Ohio standards purporting to the [sic] define what constitutes indirect criminal contempt are void for vagueness in that they do not give fair notice of what conduct is prohibited.
 {¶ 51} "II. The Ohio standards under which a person can be found guilty of indirect criminal contempt are content-based, overbroad and vague, reach a substantial amount of constitutionally protected conduct and unlawfully target a particular viewpoint facially and as applied, in violation of the First Amendment to the United States Constitution and Section 11, and Article I of the Ohio Constitution.
 {¶ 52} "III. The prosecution of defendant-appellant for statements she made within legal documents violated her right of access to the courts, due process, and her right to petition for redress of grievances under the First and Fourteenth Amendments, the right to be free from retaliation for exercising her First Amendment rights under the equal protection clause and her rights under Article Four of the United States Constitution and Section 11, Article I of the Ohio Constitution.
 {¶ 53} "IV. Defendant-appellant was denied counsel to which she was entitled under the Sixth Amendment to the United States Constitution in Article I, Section 10 of the Ohio Constitution without any constitutionally required waiver, and was denied the ability to represent herself during a critical stage of the proceedings. *Page 13 
 {¶ 54} "V. Defendant-appellant's convictions and sentence on 27 counts of indirect criminal contempt violates the double jeopardy clause of theFifth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution, where many of the counts arose out of the same conduct or pattern of conduct with a single animus.
 {¶ 55} "VI. Defendant-appellant's right to confront witnesses under the Sixth Amendment to the United States Constitution and under Section10, Article I of the Ohio Constitution was violated when the complaining witness was permitted to testify to extremely damaging impermissible hearsay statements made by declarants who never appeared in court and were thus not subject to being cross-examined. The admission of these statements also violated Mrs. Baumgartner's right to a fair trial under the Fourteenth Amendment to the United States Constitution.
 {¶ 56} "VII. Appellant's conviction must be reversed because the state failed to prove beyond a reasonable doubt that Ms. Baumgartner's conduct was contemptuous, in violation of the Fourteenth Amendment to the United States Constitution and Section 10, Article I of the Ohio Constitution and/or her convictions are not [sic] against the manifest weight of the evidence.
 {¶ 57} "VIII. Appellant's rights under the Fourteenth Amendment to the United States Constitution in Article I, Section 16 of the Ohio Constitution were violated by virtue of the fact that the presiding judge and trier of fact was a retired `visiting judge.'" *Page 14 
 I. Visiting Judges {¶ 58} We shall discuss appellant's final assignment of error first.
 {¶ 59} As evidenced by many of her cited statements, throughout these proceedings appellant has insisted that the appointment of visiting judges to cases in Ohio is unconstitutional. She points out that judges may not be elected or appointed to office after the age of 70 and that an elected or appointed judge must file an oath of office with the clerk of courts in their county of service. Neither of these strictures apply to visiting judges. Moreover, appellant insists, since the judge to whom she raised this issue was an appointed visiting judge, he should be precluded from ruling on the challenge because he has a financial interest in the outcome. As a result, she was denied a neutral magistrate as she is constitutionally guaranteed.
 {¶ 60} Appellant's eighth assignment of error is without merit. As appellee properly points out Section 6(C), Article IV of the Ohio Constitution provides that, "* * * Any voluntarily retired judge, or any judge who is retired under this section, may be assigned with his consent, by the chief justice or acting chief justice of the supreme court to active duty as a judge * * *." This express provision governs the appointment of retired judges and must be differentiated from those provisions governing active, full-time judges. State ex rel. Berger v.McMonagle (1983) 6 Ohio St.3d 28, 30-31, certiorari denied,464 U.S. 1017. Neither does such a scheme offend the federal constitution.Pocker v. Brown (C.A.6, 1987), 819 F.2d 148, 149. *Page 15 
 {¶ 61} Since this well settled, easily obtainable proposition of law greatly antedates appellant's objections, appellant was not prejudiced by the visiting judge's rejection of her repeated objections. Accordingly appellant's eighth assignment of error is not well-taken.
 II. Constitutional Challenges {¶ 62} In her first six assignments of error, appellant maintains that her contempt adjudications should be set aside on various constitutional grounds: the standard for indirect criminal contempt is overly broad or vague per se or as applied, punishing speech constitutes a denial of access to courts, she was improperly denied counsel, she was denied her right to confront witnesses, and many of the counts were duplicative in violation of double jeopardy.
 {¶ 63} "The term, `contempt of court,' embraces a despising of the authority, justice or dignity of a court, and one is guilty of such contempt whose conduct is such as tends to bring the administration of the law into disrepute and disregard or otherwise tends to impede, embarrass or obstruct the court in the performance of its functions."In re Petition for Green (1961), 172 Ohio St. 269, paragraph one of the syllabus, reversed on other grounds (1962), 369 U.S. 689. Courts have used the power to find contempt of court to vindicate their authority from the earliest days of English common law and the infancy of the republic. Respublica v. Oswald (1788), 1 U.S. 319, 329.
 {¶ 64} Although there is statutory authority for the punishment of contempt, courts have an overriding inherent power that, "* * * may not be limited by legislative authority, *Page 16 
nor does such power depend upon express constitutional grant." State v.United Steelworkers of America (1961), 172 Ohio St. 75, paragraph one of the syllabus. "The difference between the jurisdiction of courts and their inherent powers is too important to be overlooked. In constitutional governments their jurisdiction is conferred by the provisions of the constitutions and of statutes enacted in the exercise of legislative authority. That, however, is not true with respect to such powers as are necessary to the orderly and efficient exercise of jurisdiction. Such powers, from both their nature and their ancient exercise, must be regarded as inherent. They do not depend upon express constitutional grant, nor in any sense upon legislative will. The power to maintain order, to secure the attendance of witnesses to the end that the rights of parties may be ascertained, and to enforce process to the end that effect may be given to judgments, must inhere in every court or the purpose of its creation fails. Without such power no other could be exercised." Id. at 80, quoting Hale v. State (1896), 55 Ohio St. 210,213; see, also, State v. Kilbane (1980), 61 Ohio St.2d 201,International Union, United Mine Workers v. Bagwell (1994),512 U.S. 821.
 {¶ 65} Contempt is divided into four categories, classified by where the contempt takes place and the purpose for which penalty is assessed. A direct contempt takes place in the presence of the court or so near thereto as to obstruct the orderly administration of justice. In reLands (1946), 146 Ohio St. 589, 595. Indirect contempt is all other contempt. Cincinnati v. Cincinnati Dist. Council 51 (1973),35 Ohio St.2d 197, 202. *Page 17 
Either a direct or an indirect contempt may be further categorized as a civil or a criminal contempt.
 {¶ 66} The sanction for civil contempt is coercive in nature. The object of the penalty exacted is to force a contemnor to obey the dictates of the court. A civil contempt penalty generally confers a benefit upon a party. Pheils v. Palmer (Mar. 19, 1999), 6th Dist. No. L-98-1092, citing Brown v. Executive 200, Inc. (1980),64 Ohio St.2d 250, 254. Civil sentences are conditional. The recalcitrant offender may purge himself or herself of the contempt by doing that which the court has ordered. The contemnor is said to carry the keys to his own cell.Brown at 253.
 {¶ 67} What is characterized as criminal contempt is found when the purpose of the penalty exacted is to punish the contemnor for conduct which has occurred in the past. The reason for the sanction is to vindicate the authority of the court. Dayton Women's Health Ctr. v.Enix (1991), 68 Ohio App.3d 579, 591-592, Brown, supra at 253.
 {¶ 68} Direct contempt, at least misconduct occurring in open court, may be punished summarily without notice or an opportunity to be heard.Pheils, supra, citing Pounders v. Watson (1997), 521 U.S. 982. Indirect contempt may not be so treated. At a minimum, notice and an opportunity to be heard must be afforded one accused of indirect contempt. Id., citing Gompers v. Bucks Stove and Range Co. (1911), 221 U.S. 418, 444.
 {¶ 69} Indirect criminal contempt is a quasi-criminal proceeding,State v. Timson (1974), 38 Ohio St.2d 122, 129, in which most of the rights afforded a criminal defendant are required. The accused is presumed innocent until proven guilty beyond a reasonable *Page 18 
doubt. The accused cannot be compelled to testify against his or her self. The accused has a right to counsel and to call witness to give testimony. Id. There is no right to a jury trial as contempt is ordinarily considered a petty offense within the contemplation of the constitution. State v. Weiner (1974), 37 Ohio St.2d 11, 13; Crim.R. 23.
 A. Vague and Overbroad {¶ 70} In her first two assignments of error, appellant insists that the standards for criminal contempt are vague and overbroad. Appellant argues that if the tests applied to statutes applied to contempt, the result would be unconstitutional.
 {¶ 71} It is important to note that, while there is a contempt statute, see R.C. 2705.01 et seq., the specific authority relied upon to cite appellant for contempt and to find her in contempt was the inherent power of the court to vindicate its own authority. As discussed above, this is an authority that has been recognized at all levels for centuries. We note that, notwithstanding eight hundred years of contempt jurisprudence, appellant has been unable to cite a single case on point in support of her argument.
 {¶ 72} Nevertheless, appellant argues that she should not be held accountable for her pleading invective because she had not received notice of that conduct which might be deemed contemptuous. This assertion is belied by the record. Judge Markus testified that prior to August 13, 2004, he, "* * * in fact, advise[d] that these were improper comments that were being made and were in some instances simply false." The state introduced a September 29, 2004 order of the court which concluded: *Page 19 
 {¶ 73} "The court notes that some of the counterclaim defendant's assertions may well constitute criminal contempt, but the court will defer consideration of any such proceedings until it has completed the trial for this case."
 {¶ 74} The state also introduced into evidence a copy of the decision of the Supreme Court of Ohio in the disciplinary proceeding in which appellant was disbarred. Office of Disciplinary Counsel v.Baumgartner, 100 Ohio St.3d 41, 2003-Ohio-4756. A significant facet of the behavior resulting in appellant's disbarment was, "* * * numerous unfounded accusations of criminal and unethical activity against private individuals and public officials * * *." Id. at ¶ 1. This is behavior that the Board of Grievances characterized as appellant's "campaign of paper terrorism," id. at ¶ 29, and is materially the same as that put forth by appellant in this matter.
 {¶ 75} Given all this, we cannot accept appellant's assertion that she had no notice that her behavior might be contemptuous. Accordingly, appellant's first assignment of error is not well-taken.
 {¶ 76} In her second assignment of error, appellant argues that the standards of indirect criminal contempt are content based and overbroad to the extent that they infringe on her First Amendment right of free speech. Appellant maintains that indirect criminal contempt as a punishable offense is so amorphous that it may apply to anyone, anywhere and result in the suppression of any type of speech, including protected political speech. *Page 20 
 {¶ 77} We disagree with appellant's analysis. First, those in jeopardy of punishment for any type of contempt are only those within the authority of the court. Moreover, indirect criminal contempt may not be found absent a finding that the contemnor intended to impede, embarrass or obstruct the court in the performance of its duty. In re Petition forGreen, supra, Midland Steel Prods. Co. v. U.A. W. Local 486 (1991),61 Ohio St.3d 121, 127; In re Carroll (1985), 28 Ohio App.3d 6, 10. Thus, far from being overbroad, the law of indirect criminal contempt is extraordinarily circumspect. Accordingly, appellant's second assignment of error is not well-taken.
 B. Court Access {¶ 78} In her third assignment of error, appellant insists that punishing her for statements made in legal documents violates her right of access to the courts. Again, appellant contends that punishment for the exercise of free speech via contempt proceedings inhibits her federal and state right to have free access to the courts.
 {¶ 79} It is not appellant's speech that is being sanctioned, but her intent to disrupt the court in the performance of its duty. Her reckless, unwarranted and unsubstantiated allegations were merely the vehicle she chose to bring effect to her plan.
 {¶ 80} Appellant also argues that her right to equal protection is being violated because others are not being punished for statements made in pleadings. This is not accurate. See Pheils v. Palmer, supra,Fed. Land Bank Assn. of Fostoria v. Walton (1995), 99 Ohio App.3d 729.
 {¶ 81} Accordingly, appellant's third assignment of error is not well-taken. *Page 21 
 C. Denial of Counsel {¶ 82} During the principal proceedings, appellant was represented by a series of retained counsel. Indeed, some of the statements that the court found contemptuous centered on a dispute about the circumstances of one counsel's withdrawal, the ability of another to prepare and appellant's ability to retrieve files from departed counsel. At some point appellant elected to proceed pro se in that litigation.
 {¶ 83} With respect to the contempt action, on October 28, 2005, the court filed an entry in which it found that appellant had been, "* * * afforded the right to counsel and has waived same." On March 13, 2006, a week before trial, appellant filed a "Motion for Continuance of Trial Date with Notice of Assertion and Non Waiver of All Rights Including Notice of Charges, Right to Counsel, and Trial By Jury." Specifically, appellant stated that she was invoking her right to counsel because she had purportedly become afflicted with post traumatic stress syndrome as the result of an earlier 39 day incarceration, "* * * and her doctor advised it was medically ill advised to continue to represent herself." Appellant reiterated this assertion the same day in an "Affidavit of Bias and Disqualification" filed with the Ohio Supreme Court in an attempt to remove the contempt trial judge. At the outset of the contempt hearing, on March 20, 2006, appellant again raised the issue of her right to counsel.
 {¶ 84} In her fourth assignment of error, appellant insists that she was denied her Sixth Amendment right to counsel. *Page 22 
 {¶ 85} An accused in any contempt proceeding in which incarceration is possible is entitled to the same right to counsel as a criminal defendant. Schock v. Sheppard (1982), 7 Ohio App.3d 45, 47. That is, the accused must be advised that he or she has a right to counsel and, if he or she is financially unable to employ counsel, one will be appointed at the state's expense. See State v. Tymcio (1975), 42 Ohio St.2d 39. Nevertheless, it is incumbent on the accused to demonstrate a financial inability to pay. State v. Davis, 4th Dist. No. 03CA16, 2004-Ohio-1226, ¶ 10.
 {¶ 86} Appellant never filed an affidavit of indigency. In the principal case, she was clearly financially able to employ counsel, because she did so. In an incidental filing, appellant filed with the court a portion of a Chapter 13 bankruptcy filing which showed assets of between $501,000 and $1 million. The trial court found that appellant's failure to file an affidavit of indigency constituted an election to proceed pro se. This is a determination that we will not disturb on appeal. Accordingly, appellant's fourth assignment of error is not well-taken.
 D. Double Jeopardy {¶ 87} Appellant maintains in her fifth assignment of error that when the court found her guilty of contempt for multiple statements, some of which were duplicative, it violated the Fifth Amendment prohibition that she not "* * * be subject for the same offence to be twice put in jeopardy of life or limb * * *." See, also, Section 10, Article I of the Ohio Constitution. *Page 23 
 {¶ 88} This argument is specious. If one robs a bank on Tuesday and comes back and robs it again on Wednesday, it is two separate crimes. If, without justification, one accuses a judge of conducting a "secret pretrial" in a document filed on August 13, 2004, and renews this spurious allegation in another document filed September 24, 2004, it is a separate act. This is the only instance of duplication we note. Appellant has not directed our attention to any specific examples.
 {¶ 89} Appellant's fifth assignment of error is not well-taken.
 E. Confrontation Right {¶ 90} During trial, Judge Markus testified that a representative of the Chief Justice had advised him that four prior judges had recused themselves from the civil case. He also testified that several attorneys representing appellant had withdrawn, with one who petitioned Judge Markus for leave to withdraw characterizing appellant as "* * * impossible to deal with." He also testified that one of his judicial predecessors on the case told him that appellant had referred to her as a "bitch." The only objection interposed to any of these statements was an assertion that the "impossible to deal with" statement was hearsay. This objection was overruled.
 {¶ 91} In her sixth assignment of error, appellant insists that these statements were testimonial and violated of her Sixth Amendment right to confront accusers pursuant to Crawford v. Washington (2004),541 U.S. 36, 69-70.
 {¶ 92} Appellee responds that these statements were merely preliminary responses to elicit the context of the contemptuous statements appellant inserted into her court *Page 24 
filings. In any event, according to appellee, appellant could not have been prejudiced because none of the purportedly offensive statements went to the basis of any of her contempt findings.
 {¶ 93} The recusal of four prior judges is a matter of record in the underlying case, which record was judicially noticed in the contempt proceeding. The statement that appellant was impossible to deal with was not offered for the truth of the matter asserted and, therefore, was not hearsay. Evid.R. 801(C). Appellant's characterization of a prior judge as a "bitch" does not form the basis of any of the acts of contempt that were found. Accordingly, appellant's sixth assignment of error is not well-taken.
 III. Manifest Weight {¶ 94} In her remaining assignment of error, appellant suggests that there was insufficient evidence to support her contempt adjudication and that the finding of contempt was against the manifest weight of the evidence.
 {¶ 95} The standard of review for sufficiency and weight of evidence in an indirect criminal contempt is the same as that employed in a criminal case. Brown v. Executive, supra, at 252. A finding of indirect criminal contempt may be overturned if it is either against the manifest weight of the evidence or because there is an insufficiency of evidence. In the former, the appeals court acts as a "thirteenth juror" to determine whether the trier of fact lost its way and created such a manifest miscarriage of justice that the conviction must be overturned and a new trial ordered. State v. Thompkins (1997), 78 Ohio St.3d 380,387. *Page 25 
 {¶ 96} In the latter, the court must determine whether the evidence submitted is legally sufficient to support all of the elements of the offense charged. Id. at 386-387. Specifically, we must determine whether the state has presented evidence which, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The test is, viewing the evidence in a light most favorable to the prosecution, could any rational trier of fact have found the essential elements of the crime proven beyond a reasonable doubt. Id. at 390 (Cook, J., concurring); State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus. See, also, State v. Eley (1978),56 Ohio St.2d 169; State v. Barns (1986), 25 Ohio St.3d 203.
 {¶ 97} To sustain an indirect criminal contempt adjudication, there must be evidence by which a reasonable trier of fact could find beyond a reasonable doubt that an accused contemnor intended to bring the administration of the law into disrepute and disregard or otherwise intentionally impede, embarrass or obstruct the court in the performance of its functions. In re Petition of Green, supra; State ex rel. Corn v.Russo, 90 Ohio St.3d 551, 555, 2001-Ohio-15; Midland Steel Prods. Co. v.U.A. W. Local 486, supra, at 127. Intent may be shown by circumstantial evidence, State v. Huffman (1936), 131 Ohio St. 27, paragraph four of the syllabus; Walker v. City of Birmingham (1967), 388 U.S. 307, 312 at fn. 4. We recognize that judges can be subjected to rude and insolent comments and behavior. We also recognize that judges must necessarily withstand this rudeness and insolence on occasion. A judge's life is not for the meek. See State v. Conliff (1978), 61 Ohio App.2d 185, 190-191. Having said that, we finally *Page 26 
recognize that there is behavior so outrageous that it constitutes an attack on the legal system and is, therefore, contemptuous.
 {¶ 98} In the very first subpart of the contempt citation, appellant accused the trial judge and the Chief Justice of dishonesty. She has never produced any evidence to substantiate this claim or any other. She has also accused the judge of making false statements "lead[ing] to the very strong appearance of his being bribed," conducting secret proceedings, general misconduct, collusion with opposing counsel and parties, fraud, misrepresentation, "be[ing] delusional," case fixing, having a "hidden agenda," racial and religious bigotry and "[p]erhaps" torture and bondage. She accused opposing counsel, parties, and a host of elected and appointed public officials of everything from an involvement in child abuse/pornography to kidnapping to stealing public funds.
 {¶ 99} Judge Markus testified that he believed appellant used these allegations as a means to attempt to divert attention from the merits of the lawsuit and to get him to recuse himself as had four of his predecessors. The trial court agreed with this analysis, finding that the allegations, "* * * bring the entire justice system * * * into disrepute * * *. There can be no other purpose but to demean the judiciary as a whole and the trial judge in particular to cast doubt upon the validity of the legal proceedings and impede the progress of the action."
 {¶ 100} This determination certainly constitutes a finding that appellant's acts intended to bring the administration of the law into disrepute and disregard or intentionally impede, embarrass or obstruct the court in the performance of its functions. *Page 27 
There is ample evidence to support such a finding. Consequently, there was sufficient evidence to support appellant's contempt adjudication. Moreover, we have fully reviewed the record in this matter and fail to find anything to suggest that the court lost its way or that injustice resulted. Accordingly, appellant's seventh assignment of error is not well-taken.
 {¶ 101} On consideration whereof, the court finds that substantial justice has been done the party complaining, and the judgment of the Ottawa County Court of Common Pleas is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Ottawa County.
JUDGMENT AFFIRMED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4.
Arlene Singer, J., William J. Skow, J., Thomas J. Osowik, J. CONCUR.
[1] Judge Markus submitted two additional "supplementary" contempt citations after the initial accusations, but these were not considered in these proceedings.
[2] See ¶ 36 of this decision and judgment entry. *Page 1