## COMMONWEALTH _vs._ BARRY WILSON.

No. 11-P-1143.

Suffolk. September 13, 2011. - March 20, 2012.

Present: MILLS, SMITH, & WOLOHOJIAN, JJ.

_Contempt. Practice, Criminal,_ Contempt. _Attorney at Law,_ Contempt.

Discussion of summary criminal contempt pursuant to Mass.R.Crim.P. 43. [472-474]

A Superior Court judge, in entering a judgment of summary criminal contempt against an attorney who was representing a criminal defendant at a murder trial, on the basis of an outburst by the attorney during jury empanelment, correctly found that the attorney's conduct, which went well beyond vigorous advocacy and violated the Rules of Professional conduct, was wilfully contemptuous [474-476]; further, the judge correctly determined that summary punishment was necessary to maintain order in the court room [476-477]; finally, given that the judge correctly found the attorney's conduct flagrant, the exercise of the summary contempt power without a warning was justified, but in any event, the judge asked the attorney a question that, in the circumstances, was the equivalent of a warning [477].

There was no merit to the claim of an attorney, against whom a Superior Court judge entered a judgment of summary criminal contempt on the basis of the attorney's conduct representing a criminal defendant at a murder trial, that the judge erred in failing to balance the need for summary punishment against the need to ensure vigorous advocacy [477]; further, there was no merit to the attorney's claim that his representation of his client in the underlying criminal trial was chilled by the judge's deferral, pursuant to Mass.R.Crim.P. 43(b), of the imposition of a sentence for the contempt until after the completion of the trial [477-478]; finally, this court rejected the attorney's claim that the judge should have employed another remedy short of summary criminal contempt and the imposition of a jail sentence [478].

ADJUDICATION of contempt in the Superior Court Department by _Patrick F. Brady,_ J., on May 5, 2011.

_E. Peter Parker_ for the defendant.

_Elisabeth Martino,_ Assistant District Attorney, for the Commonwealth.

*Todd C. Pomerleau, Sarah Unger, & Danielle M. Wood,* for Massachusetts Association of Criminal Defense Lawyers, amicus curiae, submitted a brief.

SMITH, J. The defendant, Barry Wilson, a criminal defense attorney, appeals from the entry of a judgment of summary criminal contempt against him pursuant to Mass.R.Crim.P. 43, 378 Mass. 919 (1979). The summary contempt finding occurred during Wilson's representation of Garrett Jackson, a criminal defendant charged with murder in the first degree. After a guilty verdict was returned in that case, the judge, after a hearing, sentenced Wilson on the finding of summary criminal contempt to ninety days in the house of correction. Wilson filed a timely appeal.[1]

*Background.* As required by Mass.R.Crim.P. 43(b),[2] the judge made written findings upon which he based the adjudication of summary criminal contempt. The findings are not disputed. In addition to the transcript, we have also reviewed an audio recording of Wilson's outburst that resulted in the finding of summary criminal contempt. We begin by summarizing the incident at issue, turning then to the judge's rule 43 findings.

1. *Proceedings triggering Wilson's conduct.* On May 4, 2011, empanelment began in Superior Court in the trial of an indictment charging Jackson with murder in the first degree, with Wilson representing Jackson, an African-American male. The judge had adopted the following procedure in regard to empanelment. Each prospective juror was assigned a number and each was individually summoned to the courtroom, where the prospective juror was interviewed by the judge. After the interview, but before the attorneys exercised their peremptory challenges, if any, the prospective juror was escorted out of the courtroom and ordered to remain by the door. With the prospective juror absent, the judge would inform the attorneys whether he found the prospective juror to be indifferent. If the judge so found, the attorneys would exercise their peremptory challenges, if they had any. If the prospective juror was accepted by the

---

[1]We acknowledge the amicus brief filed by the Massachusetts Association of Criminal Defense Lawyers supporting Wilson's position.

[2]Rule 43(b) states, in relevant part, the following: "The judgment of guilt of contempt shall include a recital of those facts upon which the adjudication of guilt is based."

lawyers, he or she would be escorted upstairs to join the other selected jurors. In regard to the number of peremptory challenges, the judge originally had decided to empanel fifteen jurors, but both parties persuaded the judge to empanel sixteen jurors. Thus, each party was allotted one additional peremptory challenge. On the first day, empanelment proceeded in its normal course and there was no controversy.

The next day, May 5, the Commonwealth exercised its final peremptory challenge. The defense still had an additional peremptory challenge remaining, which it exercised on prospective juror 31. When the next prospective juror, number 32, was called to the courtroom, he did not appear, apparently not having returned from lunch as the other prospective jurors had. Wilson became upset that prospective juror 32 was not available, informing the judge that he had exercised his remaining peremptory challenge on the assumption that juror 32 was available, and he was sure the prospective juror would be found by the judge to be indifferent, and thus become the sixteenth juror.[3] Wilson then requested that the judge revert to his original plan to empanel fifteen jurors. The judge denied his request. The judge then interviewed the next two prospective jurors, numbers 33 and 34, and excused each for cause.

The judge next interviewed prospective juror number 35. That individual had a law enforcement background as an agent for the Department of Homeland Security following September 11, 2001, but was currently unemployed. Prospective juror 35 stated that he had not raised his hand to indicate an affirmative answer to any of the questions the judge had asked prospective jurors. He told the judge he was not prejudiced against black people or persons of color. He next informed the judge that he had been employed by the Immigration and Naturalization Services for about five years and, after the September 11, 2001, attack, was transferred to Homeland Security. According to prospective juror 35, he had worked in law enforcement for fifteen years. The judge asked him if his background in law enforcement would affect his ability to fairly judge the case. He

[3]Wilson explained to the judge that "[t]his was my lucky juror. He's 32. That's his number, and his age is 32. It was happening. He was going to let my client go. I'm really disturbed that he's not here."

responded, "I don't think it would, sir." The judge asked, "Are you quite sure of that?" Prospective juror 35 responded, "Yes, sir." The judge then drew his attention to certain answers in his application. Prospective juror 35 denied that he had ever been arrested, been convicted of a crime, or been a witness or sat on a jury, and stated that there was nothing in his background that might affect his ability to be fair and impartial.

2. *Conduct leading to the finding of contempt.* After the above questioning had concluded, the judge asked prospective juror 35 to step outside the courtroom. The following exchange then occurred between Wilson and the judge according to the transcript and audio disc:

> THE COURT: "[Juror 35] is indifferent. And both counsel having exercised their 16 —"

Wilson then shouted at the judge:

> WILSON: "Oh, no. Oh, no —"
>
> THE COURT: "Wait a minute."
>
> WILSON: "Oh, no."
>
> THE COURT: "Mr. Wilson —"
>
> WILSON: "No."
>
> THE COURT: "Mr. Wilson —"
>
> WILSON: "No, we're not going to say wait. We're not going to say wait. You excused a juror because she's got two kids 20 and 21, and this guy's got 15 years —"
>
> THE COURT: "Mr. Wilson —"
>
> WILSON: "— of law enforcement."
>
> THE COURT: "Mr. Wilson —"
>
> WILSON: "And you're going to sit him."
>
> THE COURT: "Listen, if you —"

WILSON:       "Lock me up now. Just lock me up and declare it a mistrial. I'm not sitting with that guy on this jury. No way."

THE COURT:    "Mr. Wilson —"

WILSON:       "No way. No way am I going to try a case with that man. That's ridiculous. Fifteen years a federal agent and he's going to be unbiased. Are you kidding me? I can't do it. I won't do it. Take my ticket. I don't really care. This is just plain ridiculous. Ridiculous. I'm going to sit there with a federal agent who says that he's not going to believe his fellow officers, are you ridiculous. You gotta be. You gotta be. I can't try the case and I won't. I will not."

THE COURT:    "Well, I'm afraid you're going to have to try the case."

WILSON:       "Oh, I don't think so. I can't. I'm not looking — I can't. I can't. How can I look at my client and say he should think this is legitimate after you make a ruling like that and you excuse a woman who had two children, and that's enough excuse? You think I would ever let a woman — whatever that man is — sit on it."

Wilson next screamed at the judge:

WILSON:       "And the other thing is I think maybe if he's [juror 35] standing outside there you better go ask him if he heard me screaming, because I think you gotta excuse him now 'cause I think he knows I don't like him."

THE COURT:    "Mr. Wilson, is there some reason that I should not hold you in contempt?"

WILSON:       "Judge, you can do what you wish to do, but I have news for you. How could you expect me to do anything different? A young man is on trial for his life, and a juror goes bye-bye. I

can — I said that I had a decision. I made decisions.

"A juror is not there, and then I — exactly everything I predict is going to happen and then it happens, and you want me to say that's okay and tell my client he should feel okay and tell my client that it's [on] the up-and-up and that it's all fine.

"You can hold me in contempt. You could send me [to] Nashua Street right now. I'll go with my client and maybe we can get a cell together and maybe you could declare a mistrial and then we can start over again because I am not — I am not going to try a case in which as far as I'm concerned the Commonwealth doesn't have a shot to be except by — except by police officers going and leaning on people and getting the changed stories.

"And now I'm going to put in the box a man who spent fifteen years in Homeland Security, and I'm going to think that my client is going to get a fair trial? I don't think if they came up and they asked to put me in the box that any prosecutor in their right mind would think that I should sit there.

"This is just, just wrong. You can do whatever you wish to me, but this is just wrong."

THE COURT: "All right. Thank you, Mr. Wilson. I've heard enough.

"I do hold Mr. Wilson in contempt. I find that his behavior is loud, insulting, disrespectful behavior. The loud voice being at least partially intended so the jurors may hear him, including the juror who is presumably waiting outside the door, is disruptive to the Court proceedings. And I am going to hold him in contempt, and I am going to sentence him.

"However, I'm going to defer the sentencing until a later date. I respect the defendant's right

to have counsel of his choosing try the case, so I'm not going to interfere with that. Mr. Wilson will be expected to continue to defend Mr. Jackson, and at the conclusion of the case I'm going to sentence him appropriately.

"He is held in contempt, and those are my findings."

WILSON:     "You can't do that. You can't do that because what I'm going to put on record right now is you going to send me to jail, but if I act like a good boy, maybe I'll only go to jail for a few days. If I act like a bad boy, then I'll go to jail for a few weeks or a few months, or whatever time I don't know.

"But in any event, what we have is now I have to consider whether or not I can do the right thing by my client or can I do the right thing by me. Will I go to jail or won't I go to jail or how long I go to jail.

"So what I suggest is I can't represent my client. You've held me in contempt now."

THE COURT:     "Take [juror 35] upstairs. We'll break for five minutes. We'll resume. I'll bring the jurors down. I'll excuse them for the day. If there's any other legal matters that have to be taken up this afternoon, I'll do that then. We'll recess for five minutes."

WILSON:     "I'm not done. I'm not done. Let the record reflect that I cannot represent my client anymore because I've been held in contempt and the condition of my contempt will not be decided until the Court — the trial is over. And I cannot make a determination based — I cannot conduct myself in a manner that I'm supposed to or not supposed to, but I cannot be a zealous advocate and within the propriety of what my responsibilities are under the code of professional ethics because I don't know.

> "Right now I have to worry about me instead of worrying about my client, and if I got to worry about me instead of my client, then I can't worry about my client, then I can't do my job because under the code my first responsibility is to my client."

THE COURT: "All right. Five minute recess."

Wilson's angry outburst covered over five pages of the transcript and over two minutes on the audio disc. The trial proceeded with Wilson representing Jackson. On May 17, 2011, Jackson was found guilty of murder in the first degree and sentenced.

3. *The judge's findings.* On May 9, 2011, the judge, pursuant to rule 43(b), issued written findings, including "a recital of those facts upon which the adjudication of guilt [of summary contempt was] based." See note 2, *supra.* Among other things, the judge found that Wilson, during jury empanelment, had "delivered a loud, abusive, insulting and disruptive outburst in defiance of the court's ruling." The judge noted that "[o]n several occasions the court attempted to interrupt what from the beginning was an obviously inappropriate and disruptive outburst." Further, the judge found that Wilson did not stop but, rather, called the judge's ruling "ridiculous" and the judge "ridiculous." On this basis, the judge found that Wilson's outburst, at least in part, "was likely motivated, (based on . . . Wilson's statements) by a desire to force the court to excuse [prospective juror 35] because . . . Wilson's screaming was so loud the juror may have heard and concluded that . . . Wilson 'did not like him.' " The judge found that "[t]he contemptuous conduct, reflected in the transcript and on the audio disc of the court reporter, occurred in my presence, was disruptive of the court proceedings and a direct challenge to the authority of the court. Under the circumstances, it was necessary for the court to proceed under the summary contempt rule to maintain order in the courtroom."

4. *The sentencing hearing.* On May 19, 2011, the judge conducted a hearing to determine the sentence to be imposed on Wilson.[4] Wilson was represented by counsel.

---

[4] At the hearing, the judge also considered Wilson's counsel's motion to

The judge asked Wilson's counsel if there were any mitigating factors that she wanted to bring to his attention. Wilson's counsel stated that "in light of our position that there wasn't sufficient conduct here to justify a contempt finding, it's difficult to really comment on the sentence." Wilson's counsel, nevertheless, did argue, in mitigation, that because it was a murder trial, Wilson became emotional, as he had been practicing for a long time and "[t]here's been many changes in the criminal justice system in the last thirty-six years that have gone against criminal defendants which Attorney Wilson feels strongly are unconstitutional." At this point, Wilson's counsel requested permission for Wilson to make a statement. The judge allowed the request.

Wilson stated, among other things, that he is a "zealous advocate." The reason for his outburst was because he did not have a jury "that's going to give my client a fair trial." Wilson then stated that "racism is alive and well in America[] . . . I've done this for thirty-six years, and I think it's people like myself that give this system a legitimacy because we try to defend our people. We try to do what's right. And if people don't have lawyers that stand up, then guess what? The system just railroads them. That's what happened. . . . Remember, my role is to be a zealous advocate."

After Wilson concluded his remarks, the judge told him that "your behavior before me two weeks ago was atrocious. It's the worst that I've ever seen in the twenty-two years of presiding over trial." The judge then imposed a sentence of ninety days in the house of correction but stayed execution of the sentence until June 29, 2011. By order dated July 5, 2011, a single justice of this court allowed Wilson's motion to stay execution of the sentence for the duration of the appeal.

*Discussion.* On appeal, Wilson claims that summary criminal contempt was not available as matter of law because (1) his conduct was not contemptuous; (2) the judge violated the requirements of rule 43 and decisional law; (3) the judge failed to balance the need for summary punishment against the need to

---

have the judge reconsider his finding of summary criminal contempt and also recuse himself from the proceedings. After listening to Wilson's counsel, the judge denied both motions. Wilson does not raise the denial of those motions as issues in his appeal.

ensure vigorous advocacy; and (4) the judge should have employed another remedy, short of summary criminal contempt, and should not have deferred punishment.

There is no question that "[l]ongstanding precedent confirms the power of courts to find summary contempt and impose punishment." *Commonwealth* v. *Nicholas*, 74 Mass. App. Ct. 164, 166 (2009), quoting from *Pounders* v. *Watson*, 521 U.S. 982, 987 (1997). See *Sussman* v. *Commonwealth*, 374 Mass. 692, 695 (1978) ("Trial judges have the inherent power to deal with contumacious conduct in the courtroom in order to preserve the dignity, order, and decorum of the proceedings").

The courts recognize, however, that summary contempt power "is conceived narrowly and used with great restraint." *Commonwealth* v. *Viera*, 41 Mass. App. Ct. 206, 208 (1996). "The exercise of the summary power of contempt is 'a delicate one and care is needed to avoid arbitrary or oppressive conclusions.' " *Commonwealth* v. *Diamond*, 46 Mass. App. Ct. 103, 106 (1999), quoting from *Sussman* v. *Commonwealth, supra* at 696, quoting from *Bloom* v. *Illinois*, 391 U.S. 194, 202 (1968).[5]

In Massachusetts, summary criminal contempt is governed by rule 43 ("Summary Contempt Proceedings").[6] The rule states that "criminal contempt may be punished summarily when it is determined that such summary punishment is necessary to

---

[5] " 'Summary' contempt 'does not refer to the timing of the action with reference to the offense but refers to a procedure which dispenses with the formality, delay and digression that would result from the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial.' " *Commonwealth* v. *Nicholas*, 74 Mass. App. Ct. at 168, quoting from *Sacher* v. *United States*, 343 U.S. 1, 9 (1952).

[6] Rule 43(a) provides as follows:

"Availability of Summary Proceedings. A criminal contempt may be punished summarily when it is determined that such summary punishment is necessary to maintain order in the courtroom and:

"(1) The contemptuous conduct could be seen or heard by the presiding judge and was committed within the actual presence of the court;

"(2) the judgment of contempt is entered upon the occurrence of the contemptuous conduct; and

"(3) the punishment imposed for each contempt does not exceed three months imprisonment or a fine of five hundred dollars."

maintain order in the courtroom." Rule 43 also sets out certain conditions or requirements that must exist before a judge may enter a finding of summary contempt. *Commonwealth* v. *Nicholas*, 74 Mass. App. Ct. at 166-167. Those conditions that are relevant to our discussion include the following: "the judgment of contempt is entered upon the occurrence of the contemptuous conduct"; and "the punishment imposed for each contempt does not exceed three months punishment or a fine of five hundred dollars." See note 6, *supra*. "The Supreme Judicial Court has additionally required that unless the [contemptuous] conduct is 'flagrant,' a prior warning is required as a prerequisite to treating the alleged contempt summarily." *Commonwealth* v. *Brunnell*, 65 Mass. App. Ct. 423, 424 (2006), citing *Sussman* v. *Commonwealth, supra* at 697. If any of the conditions are missing, "the lawful procedure, assuming some plausible charge of contempt, is to go under rule 44 and proceed more deliberately, with customary procedural safeguards familiar to ordinary criminal trial." *Commonwealth* v. *Viera*, 41 Mass. App. Ct. at 209.

"[I]n reviewing the defendant's claim that the judgment of summary contempt should be reversed on the ground that it is not supportable as matter of law . . . , it is not our function to second guess the considered judgment of the trial judge or to ignore the record before us. Rather, we will sustain the judge's contempt finding if, upon a careful review of the record, we conclude that the trial judge reasonably could have found that the [defendant's] conduct was wilfully contumacious beyond a reasonable doubt." *Commonwealth* v. *Brunnell*, 65 Mass. App. Ct. at 427. We turn now to the individual issues raised by Wilson on appeal.

1. *Conduct.* Wilson first claims that his conduct did not rise to a level requiring a finding of summary contempt. "Contumacious conduct may take many forms . . . ." *Sussman* v. *Commonwealth*, 374 Mass. at 696. "Contempt may . . . consist of an objectionable manner, speech, attitude, conduct, and tone of voice in the court room." *Albano* v. *Commonwealth*, 315 Mass. 531, 535 (1944).

Here, once the judge declared prospective juror 35 to be indifferent, Wilson, instead of taking those steps necessary to preserve his client's right of appellate review, displayed his

displeasure with the judge's ruling by engaging in an angry and lengthy assault on the judge, his ruling, and the criminal justice system. In his tirade, Wilson used disrespectful, insulting, defiant, and disruptive words in a loud tone of voice, often yelling at the judge. At one point in his outburst, Wilson screamed and said to the judge, "[Y]ou better go ask [juror 35] if he heard me screaming, because I think you [have to] excuse him [from jury duty] 'cause I think he knows I don't like him."

It is clear from the transcript, and from listening to the audio recording disc, that Wilson's lengthy tirade was not the result of the loss of his temper but rather an intentional attempt to goad the judge into either dismissing juror 35 because he heard Wilson screaming, or declaring a mistrial.

The outburst was unprofessional conduct. Wilson claims, however, that his conduct was not contemptuous but rather vigorous advocacy, citing *Sussman* v. *Commonwealth, supra* at 696. In *Sussman*, the court stated that "[i]n a summary criminal contempt proceeding against an attorney based on his court room conduct, we must balance the trial judge's obligation to protect the processes of orderly trial with the attorney's obligation zealously to protect the client's interest. In determining whether the power to punish summarily is justified, we must give due weight to the importance of vigorous advocacy. To do otherwise would chill the less courageous attorney in his efforts to represent his client effectively." *Ibid.*

There are, however, limits to vigorous advocacy.[7] The oath of office of an attorney states, in relevant part, "I will conduct myself in the office of an attorney within the courts according to the best of my knowledge and discretion, and with all good fidelity as well to the courts as my clients." G. L. c. 221, § 38. Further, the Rules of Professional Conduct governing a lawyer's

---

[7] In *Sussman, supra*, the attorney was representing an individual in a criminal trial. The judge held him in summary criminal contempt, ruling that the attorney had not properly rephrased a question to which the judge had sustained an objection. 374 Mass. at 695. The Supreme Judicial Court reversed because, among other things, it ruled that the attorney's conduct was not contemptuous. *Id.* at 702.

The court did not address the limits to vigorous advocacy because that issue was not before it. We note, however, that the attorney's conduct in *Sussman* was absolutely benign compared with the angry, lengthy outburst in this matter.

responsibilities limit an attorney's conduct in this regard. Rule 3.5(c) of the Massachusetts Rules of Professional Conduct, 426 Mass. 1391 (1998), states: "A lawyer shall not: . . . (c) engage in conduct intended to disrupt a tribunal,"[8] and Mass.R.Prof.C. 8.4(d), 426 Mass. 1429 (1998), provides: "It is professional misconduct for a lawyer to: . . . (d) engage in conduct that is prejudicial to the administration of justice." Here, it is clear that Wilson's conduct went well beyond vigorous advocacy and violated the Rules of Professional Conduct. In fact, our research discloses that it is without parallel in the written decisions of the Commonwealth's courts. As such, it represented a serious threat to the administration of justice in the trial courts of the Commonwealth.

In sum, the record demonstrates that the judge correctly found that Wilson's conduct was wilfully contemptuous.

*2. Disruption of order in the courtroom.* Wilson claims that summary punishment was not necessary because his conduct did not disrupt the court proceedings, no juror heard Wilson's outburst, and the courtroom was "virtually empty" at the time of Wilson's contemptuous conduct.

Rule 43(a) states that a "criminal contempt may be punished summarily when it is determined that such summary punishment is *necessary to maintain order in the courtroom* . . ." (emphasis added). The issue, thus, is not whether Wilson's conduct occurred in the hearing of jurors or occurred before a limited number of people in the courtroom. Rather, the issue is whether the judge was correct in determining that summary punishment was necessary to maintain order in the courtroom. We conclude that he was.

Wilson's lengthy tirade interrupted the proceedings. Seven times the judge tried to have Wilson stop, but those efforts were uniformly rejected. Even when the judge asked Wilson, "Mr. Wilson, is there some reason that I should not hold you in contempt?" Wilson persisted in his outburst. It was not until the

---

[8]Comment [2] to Mass.R.Prof.C. 3.5(c), 426 Mass. 1392 (1998), states in relevant part: "The advocate's function is to present evidence and argument so that the cause may be decided by law. *Refraining from abusive or obstreperous conduct is a corollary of the advocate's right to speak* on behalf of litigants" (emphasis added).

judge made a finding of contempt, ruled that he would defer sentencing until after the trial, and removed himself from the courtroom for a five minute recess that order was finally restored. See *Commonwealth* v. *Malley*, 42 Mass. App. Ct. 804, 811 (1997) (summary contempt proper where criminal defendant had interrupted judge on seventeen occasions, asked judge to put him in jail, shown disrespect for the judge and judicial process, and indicated he would not go forward with trial).

"In light of [Wilson's] conduct, it is clear that summary punishment was necessary in order to maintain order in the courtroom." *Ibid.*

3. *Failure to warn.* Wilson claims there was no contempt as matter of law because the judge failed to warn him before holding him in contempt.

"A warning is not a condition precedent to criminal contempt in all cases." *Commonwealth* v. *Brunnell, supra* at 427. Flagrant contemptuous conduct can justify the exercise of the summary contempt power without a warning. *Ibid.* The judge found that Wilson's conduct was flagrant. We agree. We note that the record shows that the judge, before holding Wilson in contempt, tried seven times to stop him, to no avail. Finally, the judge's question, "[I]s there some reason that I should not hold you in contempt?" was the functional equivalent of a warning because it would have put any reasonable attorney on notice of the consequences of continuing his disruptive behavior.

4. *Other issues.* a. Wilson claims the judge committed error because he failed "to balance the need for summary punishment against the need to ensure vigorous advocacy."

As we have explained earlier in this opinion, Wilson engaged in a lengthy verbal assault on the judge and the judicial system. The judge tried to stop Wilson's outburst, but he proceeded to continue yelling at the judge and refused to continue with the trial. Wilson's conduct was not vigorous advocacy but rather unprofessional conduct that required summary punishment.

b. Wilson argues that because the judge deferred punishment until after the murder trial, it chilled his representation of his client.

Rule 43(b) states, "Where the interests of orderly courtroom

procedure and substantial justice require, the presiding judge may defer imposition or execution of the sentence until after the trial is completed." See *Sussman* v. *Commonwealth, supra* at 700 n.7, citing, inter alia, *Taylor* v. *Hayes,* 418 U.S. 488, 498-499 (1974). In the circumstances present here, the judge properly deferred punishment to the end of the murder trial.

Wilson offers no evidence to support his claim that the deferred punishment chilled his representation of his client. In any event, because his client was convicted of murder in the first degree, that person will receive a broad review, both as to law and evidence. G. L. c. 278, § 33E.

c. Wilson claims that the judge should have employed another remedy short of summary criminal contempt and a jail sentence.

As far as we can determine from this record, Wilson never asked for another remedy. Indeed, when asked for any mitigating circumstances, Wilson responded, at first, that because he did nothing wrong, he refused to offer any mitigating circumstances. When he did speak on the question, he stated that the system was racist and he was a "zealous advocate."

Wilson has a right to his own opinions but he has no right to interrupt the proceedings and turn the courtroom into a platform from which to hurl disrespectful words at the judge and the criminal justice system because he did not agree with the judge's ruling. In these circumstances, we reject Wilson's claim.

Any remaining issues are without merit.

*Judgment affirmed.*